64014. MONAHAN v. SIMS et al.
64015. SIMS et al. v. MONAHAN.
64220. HUDSON v. MONAHAN.

BIRDSONG, Judge.
Jurisdiction over Ecclesiastical Matters. This case initially came before this court as a motion for interlocutory appeal, which this court granted. The issue presented therein related to jurisdiction over a Cobb County resident by a Fulton County Court where all resident Fulton County defendants had won summary judgment. Before this court acted, the trial court granted summary judgment to all defendants, whereupon a final appeal was made by the plaintiff-appellee, Ms. Monahan. The granted interlocutory appeal has thus been mooted and we proceed to the merits of the appeal of the plaintiff-appellant and cross appeals of the defendant-appellees. The three appeals have resulted in approximately a 1,750-page record and 12 voluminous briefs. From this wealth of material, this court has distilled the following procedural path to this court.

The appellant in the main appeal, Evelyn Monahan, is a professor of parapsychology at Georgia State University. She has

written several books on psychic phenomenon. She makes claims to psychic powers including telekinesis, clairvoyance, and telepathy. There is evidence that she has attended at least one seance. Ms. Monahan was formerly of the Roman Catholic faith. She transferred her allegiance to the Episcopalian denomination in 1977. Ms. Monahan became involved in the experiment in ministry program of the Episcopal church seeking ordination as a priest in the Episcopalian ministry. In September, 1978, she was assigned as a senior seminarian to St. David's Parish in the Atlanta Diocese of the Episcopal church. Her immediate supervisor in this parish was Rev. Kendrick, the parish priest. During this early observation period, Ms. Monahan was informed by the director of the experiment in ministry program that, in his opinion, Ms. Monahan was not suitable for priesthood. Also the Presiding Bishop of the Atlanta Diocese, Bishop Sims, expressed to Ms. Monahan his concern about Ms. Monahan's apparent preoccupation with the occult. The chairman of the commission on ministry (which commission passed upon the qualifications and recommended the ordination or non-ordination of priests in the Atlanta Diocese), Rev. Johnson, cautioned Ms. Monahan that her collegial relationships, her understanding and obedience to Anglican traditions, and to male church authority were matters of concern.

Nevertheless, in January, 1979, Ms. Monahan was admitted to the status of postulancy, the first step toward ordination as a priest. While initially the commission on ministry would not recommend Ms. Monahan for the status of postulancy, at the behest of the presiding bishop (Sims), she was admitted to that status.

During her postulancy, Ms. Monahan's supervising priest (Kendrick) became ill and temporarily was suspended from his priestly duties at St. David Parish. Ms. Monahan was then transferred to another parish under the supervision of Rev. Driesbach to continue her period of postulancy. At the time of this transfer, Bishop Sims and Ms. Monahan discussed possible assignments and salaries should the commission on ministry recommend her elevation to the priesthood.

Toward the end of June, 1979, Bishop Sims asked Rev. Kendrick, Ms. Monahan's first supervisor, who was then recuperating from his illness, to assist Bishop Sims' inquiry into Ms. Monahan's preoccupation with exorcism. Kendrick furnished Sims two names, both male acquaintances of Ms. Monahan who were aware of her involvement with parapsychology and related disciplines. Bishop Sims furnished these names to the chairman of the commission on ministry, Rev. Johnson. Bishop Sims further instructed Rev. Johnson to inquire into Ms. Monahan's suitability

for the ministry. Johnson contacted one of the men identified to him by Bishop Sims and was informed by this man that Ms. Monahan "would make trouble for the church and was involved in black magic." The second gentleman referred Rev. Johnson to several other persons including Jane Hudson and a Mr. Cahill. Cahill, upon contact, stated his only reservation was that Ms. Monahan was involved with another woman. Ms. Hudson expressed a reservation in that she believed Ms. Monahan has been engaged in a homosexual relationship with a married woman and that Monahan was capable of "negative mind power," a euphemism for casting spells as a witch.

At this point Rev. Johnson reported his tentative findings to Bishop Sims. Bishop Sims discussed the implications of these findings with the administrative bishop of the parish, Bishop Childs and Rev. Johnson. It was decided to disclose and discuss these reports with Ms. Monahan. When presented with these reports Ms. Monahan threatened to go to court. Bishop Sims indicated that the information also should be presented to the commission on ministry so that it could evaluate the sources as well as the information. Ms. Monahan expressed no objection to the release of the information to the commission on ministry. Later that same day, with Ms. Monahan present, the commission on ministry met and heard the substance of the reports as well as an earlier report that Ms. Monahan had committed a battery on a woman. At this meeting and upon the insistence of Ms. Monahan, the commission was asked to announce immediately whether it would recommend Ms. Monahan for elevation to the priesthood. At this time, the commission announced its concern over the failure of the director of the experiment in ministry program initially to recommend Ms. Monahan for postulancy, Ms. Monahan's alleged difficulty in adhering to Anglican dogma, and her difficulty in fully cooperating with male church authority.

When the commission stated it was not in a position at that time to recommend her to elevation to priesthood, Ms. Monahan threatened a "gigantic libel suit." Ms. Monahan was not removed from her position as a postulant nor was she accused of any misconduct by the church authorities. She was not denied irrevocably (or otherwise) ultimate admission to the priesthood. Because she was still in a probationer's status, her two superiors, Rev. Kendrick and Rev. Driesbach were informed of the nature of the report and the commission on ministry's interim decision not to elevate Ms. Monahan to the priesthood.

Ms. Monahan brought the present suit against the pastoral and administrative bishops, Sims and Childs; the chairman of the commission on ministry, Rev. Johnson; the supervisor under whom

she first worked as a postulant, Rev. Kendrick; the witness, Jane Hudson; and the Episcopal Diocese of Atlanta (i.e., the church), alleging defamation, intentional infliction of emotional distress, and breach of contract or interference with her employment.

The facts show that Jane Hudson (a member of the Episcopal Church) is a medium who apparently has a substantial reputation as a clairvoyant. Ms. Monahan had visited Hudson while researching a book Monahan was authoring on parapsychology. Two women accompanied Ms. Monahan to a scheduled seance. Hudson claimed that during this visit Monahan and one of the women discussed an on-going homosexual relationship. Also Hudson claimed to recognize Ms. Monahan (like herself) as one capable of exercising negative mind power. At the time Hudson responded to Rev. Johnson's telephone inquiry, she had been made aware of the nature of the subject matter and indicated a fear of Ms. Monahan's negative mind power (spellbinding power). For these reasons she demanded and was assured that her comments would be confidential and that the information would be used for the limited purpose of the inquiry into the eligibility of Ms. Monahan's elevation to the priesthood.

Upon motion for summary judgment by the defendants that the matter was an ecclesiastical matter and not within the jurisdiction of a civil court, the trial court denied summary judgment on that ground but granted summary judgment to the ecclesial defendants on the ground that there had been no publication outside of ecclesial circles. Subsequently, because all the ecclesial defendants were resident in Fulton County and Ms. Hudson was a resident of Cobb County, the court also granted summary judgment to Ms. Hudson for failure of venue over the sole remaining defendant who was a resident of Cobb County. Ms. Monahan brings the main appeal contesting the grant of summary judgment to all defendants (Case No. 64014); the ecclesial defendants cross appeal for failure to grant their motion for lack of jurisdiction over an ecclesiastical matter (Case No. 64015); and Hudson cross appeals on the ground of failure to grant her summary judgment for lack of jurisdiction over an ecclesiastical matter, privilege, and other legal grounds (Case No. 64220). *Held:*

1. The grant of summary judgment to the Episcopal appellees was based on lack of publication and further that the information was privileged. Ms. Hudson was granted summary judgment because the Episcopal appellees, the only Fulton County defendants, had been dismissed on summary judgment and the court could exercise no jurisdiction over a non-resident Cobb County defendant.

This court has no disagreement with the trial court's conclusion, as to result. The only communication of the allegedly defamatory information concerning Ms. Monahan apparently related to an

allegation that Ms. Monahan was engaged in a homosexual liaison and practiced black magic. The communication of this information primarily came from one Cahill and Jane Hudson (a member of the Episcopal Church) to Rev. Johnson, a priest of the Episcopal Church who was charged with the duty of inquiring into the fitness of Ms. Monahan for priesthood in that church. We note that the allegations made by Ms. Hudson were not volunteered; they were made only after inquiry had been made by an authority of Ms. Hudson's church. The allegedly defamatory communications made by Ms. Hudson further were disseminated among Rev. Johnson, Rev. Driesbach, Bishop Child, and Bishop Sims and to certain unidentified members of the commission on ministry. The record clearly reflects, however, these communications were made pursuant to the church's official observation of Ms. Monahan in her probationer status and the church's inquiry into her suitability for elevation to candidacy for priesthood in the Episcopal church. The information was fully disclosed and discussed with Ms. Monahan and with her permission disclosed to the members of the commission on ministry whose responsibility it was to determine whether Ms. Monahan should be recommended for candidacy as a priest. Except for these communications, and possibly including ultimate discussion with counsel, no further communication of the allegedly defamatory information was made by any of the ecclesial defendants or by Ms. Hudson.

Publication of allegedly defamatory information in the course of an employer's investigation of an employee's job performance, when made to persons in authority, is not "publication" within the meaning of the law. *King v. Schaeffer,* 115 Ga. App. 344 (154 SE2d 819). It has been held that there is no improper publication of defamatory information when the information regarding the employee's job performance is communicated to members of the employer's personnel committee. *LuAllen v. Home Mission Board,* 125 Ga. App. 456 (188 SE2d 138). We particularly note that in the *LuAllen* case, supra, it was held that the malice with which communications may be made is immaterial where there is no legal publication of the defamatory information.

Under Georgia law, before liability is imposed there must be publication of the defamatory information to those other than those who are privileged to communicate or receive the information. *Garrett v. Lockheed Aircraft Corp.,* 98 Ga. App. 443 (106 SE2d 333).

In this case the record reflects without dispute that the church conducted its inquiry and meetings on a confidential basis. Ms. Hudson insisted on confidentiality before relating her mental

impressions and her recollections of Ms. Monahan's conversation to Rev. Johnson. Though there appears to have been dissemination of the decision of the commission on ministry to persons not in official positions, the record is completely silent as to how the information became known to persons other than appropriate church officials. Thus, there is no indication or proof of improper publication of the defamatory information by any of the defendants below. There being no publication it follows that the trial court correctly granted summary judgment to the appellees upon that legal theory.

2. This does not dispose of the entire controversy however. The Episcopal appellees and Ms. Hudson primarily sought summary judgment based upon lack of jurisdiction. We conclude on the basis of the facts and the law that the trial court erred in failing to grant summary judgment on that basis. Once having evaluated the evidence and having determined that the information communicated was privileged as matters evolved during an investigation pertaining to canonization of a priest, the trial court was faced with what it should have concluded was an ecclesiastical matter.

The Supreme Court of the United States early in its existence recognized the sanctity and exclusivity of ecclesiastical decisions. In Watson v. Jones, 80 U. S. 679 (13 Wall. 679), the court held at pp. 728-729: "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association . . ., is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." In a later opinion the Court held: "The [Watson v. Jones] opinion radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation — in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." Kedroff v. St. Nicholas Cathedral, 344 U. S. 94 (73 SC 143, 97 LE 120) at p. 116.

"Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a [priest] are and whether the candidate possesses them. In the absence of fraud, collusion or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so . . . ." Gonzalez v. Roman Catholic Archbishop of Manila, 280 U. S. 1 (50 SC 5, 74 LE 131) at p. 16.

Subsequently, consideration of the expression "fraud, collusion or arbitrariness" required the court to consider the possibility of marginal civil court review in cases challenging decisions of ecclesiastical tribunals resulting from fraud, collusion or arbitrariness. The Supreme Court of the United States rejected such a marginal review in ecclesiastical matters. "We have concluded that whether or not there is room for 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes, no 'arbitrariness' exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U. S. 696 (96 SC 2372, 49 LE2d 161) at p. 713. ". . . Where resolution of the disputes cannot be made without extensive inquiry by civil courts into the religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." Milivojevich, supra, at p. 709.

Under the facts presented to the trial court, in the absence of improper publication or evidence pointing to fraud or collusion (a factor not supported by any evidence of record), this record presents a pure ecclesiastical matter. The decision of the Episcopal Diocese in Atlanta was binding and beyond the jurisdiction of the trial court to review. We conclude the trial court should have granted summary judgment to the Episcopal appellees and Ms. Hudson on the primary ground presented by them in their respective motions for summary judgment. Accordingly, we will affirm the judgment to the appellees in the main appeal (Case No. 64014) inasmuch as a judgment right for any reason will be affirmed. *Argonaut Ins. Co. v. Cline,* 138 Ga. App.

778, 782 (4) (227 SE2d 405). By obvious inclusion, this likewise requires the grant of summary judgment upon the grounds advanced by the appellees in their cross appeals in Case Nos. 64015 and 64220.

*Judgment affirmed in No. 64014. Judgment reversed in 64015 and 64220. McMurray, P. J., and Banke, J., concur.*

DECIDED SEPTEMBER 7, 1982.

*Lawrence B. Custer, Jud E. McNatt,* for appellant (case no. 64014).

*Eugene P. Chambers, Jr., Clyde E. Rickard III, Daryll Love, Anthony L. Cochran, Allen S. C. Willingham,* for appellee (case no. 64014).

*Anthony L. Cochran, Daryll Love, Allen S. C. Willingham,* for appellant (case no. 64015).

*Margie Pitts Hames, William Stringfellow, Lawrence B. Custer, Jud E. McNatt,* for appellee (case no. 64015).

*Eugene P. Chambers, Jr., Clyde E. Rickard III,* for appellant (case no. 64220).

*Margie Pitts Hames, Anthony L. Cochran, Edward E. Augustine, Lawrence B. Custer, Jud E. McNatt,* for appellee (case no. 64220).