77181. McDONNELL v. EPISCOPAL DIOCESE OF GEORGIA.
(381 SE2d 126)

BEASLEY, Judge.

Appellant, Father Richard McDonnell, was selected by the Episcopal Diocese of Georgia to serve as minister for two of its mission churches. After he had served for about one-and-a-half years, he was

terminated from that capacity by the diocese against his wishes. He sued to recover damages for breach of an alleged employment contract. The trial court granted summary judgment to the diocese and denied partial summary judgment to appellant on the issue of the existence of such a contract.

When Father McDonnell accepted the call, the diocese furnished him with a copy of a manual of directives entitled "Diocesan Policies and Practices and Liturgical Customary." He asserts that a binding 3-year contract was created by the following language contained in this document: "DIOCESAN MISSION CLERGY. When a clergyman accepts the Diocesan's call to fill a mission cure in the Diocese, such acceptance constitutes an implied agreement that his tenure will be for a *minimum* of three years. Resignation prior to three years, unless such termination is by mutual agreement by the Bishop and the clergyman, constitutes a breach of contract."

A provision of the manual dealt with involuntary termination: "INVOLUNTARY TERMINATION. It is recognized that, from time to time, a pastoral situation may occur which might necessitate a priest's removal from his cure. The Diocesan Council has urged the Diocesan to offer such a clergyman a reasonable period of transition, during which he may be relieved of all pastoral responsibilities."

Father McDonnell asserts that, pursuant to the manual, his termination from this position prior to the expiration of three years was effected without "such cause as would necessitate a priest's removal from his cure under the policies, practices and, or customs of [the Diocese]."

We hold that summary judgment was mandated, but for a very different reason than stated in the appealed judgment. The trial court was prohibited by the First Amendment, applicable to the courts of Georgia by the Fourteenth Amendment, from exercising judicial authority in this dispute. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U. S. 696 (96 SC 2372, 49 LE2d 151) (1976); *Crowder v. Southern Baptist Convention*, 828 F2d 718 (11th Cir. 1987); *Monahan v. Sims*, 163 Ga. App. 354, 359 (2) (294 SE2d 548) (1982).

Neither the defendant nor the court raised this issue below, and it did not arise until oral argument in this court, after which the parties filed supplemental briefs to discuss it. Even though it was not raised in defendant's motion for summary judgment, the trial court must sua sponte ascertain whether it has jurisdiction, when it appears that it may not. OCGA § 9-12-16; *Southeastern Underwriters Assn. v. Cravey*, 216 Ga. 599, 600 (118 SE2d 471) (1961); *Baggett Transp. Co. v. Barnes*, 108 Ga. App. 68 (132 SE2d 229) (1963). The same threshold inquiry must be made by ours. *Barland Co. v. Bartow County Bd. of Tax Assessors*, 172 Ga. App. 61, 62 (322 SE2d 316)

(1984). The civil court cannot take jurisdiction of an ecclesiastical issue even if the parties present it for resolution, because the First Amendment prohibits such action by the civil judicial system.

The entanglement of civil authority into ecclesiastical affairs which is prohibited by our fundamental law and which was one of the promptings of the creation of this nation is evident in this lawsuit. A priest sues his church, bringing to a civil court a dispute over his termination as vicar of one mission church and priest-in-charge of another. He seeks monetary damages representing lost wages, consequential damages, interest and costs, claiming breach of an alleged civilly enforceable contract governing his call.

Father McDonnell submits that the contract was formed by his acceptance of the call, which acceptance was based on a provision in a manual. He urges that his termination before the expiration of three years was not in conformity with the manual's provision for involuntary termination. He contends that, in the words of the manual, his circumstances could not be described as "a pastoral situation . . . which might necessitate a priest's removal from his cure."[1]

Thus Father McDonnell places before the civil court, and seeks to place before a jury, the question of whether the bishop, as head of the church in Georgia, was legally justified in removing him from this cure.

The trial court, and this court, have become embroiled in a controversy over whether the words of the manual constitute a legally enforceable contract. Resolution is sought by the application of principles fashioned for nonecclesiastical employer-employee relationships and for the construction of contracts generally. To do this it is necessary to enter the fray even deeper by determining whether in the church's polity the manual's language conflicts with the provisions of the canons and, if so, whether the canons govern.

As shown by the foreword to the manual, it was written by the bishop and the diocesan administrator and is described as a collection of "diocesan directives" and as "policies." The administrator rather than the bishop prepared the sections heretofore quoted. Canon 6 Section 2 provides that: "The Missions of the Diocese shall be under the supervision and control of the Bishop. He shall appoint all Mission clergy and may, at his discretion, suspend or remove them." The bishop is elected by the church's Convention, which according to the church's constitution, is to be convened annually. He is the ordinary of the diocese (Canon 0) and serves as president of the Council, which is directed to "carry out the policies, programs and directives of Con-

---

[1] "Spiritual charge; care of souls; the office of a parish priest or of a curate; hence, that which is committed to the charge of a parish priest or of a curate; a curacy." Webster's New Intl. Dictionary, 2nd ed., Unabridged.

vention; . . . ." (Canon 15 Section 1.)

The case of *Serbian Eastern Orthodox Diocese v. Milivojevich,* supra, involved the church's removal of the bishop, as well as his ultimate defrocking, and the reorganization of the diocese into three dioceses. The Supreme Court held that the Illinois state courts contravened the First and Fourteenth Amendments by engaging in improper inquiries into ecclesiastical matters, a prohibited zone even though some property questions were involved. That decision, and those upon which it is built, constitute the firm foundation upon which the unavoidable conclusion must be reached in this case, which is that it involves a religious dispute the resolution of which does not belong in the civil tribunal.

For the court to decide whether a binding civil contract was intended; for the court to construe the meaning of that contract if there is one, or leave to a jury its construction if ambiguity raises questions of fact; for the court or jury to determine whether canons or manual directives control; and most clearly, for a jury to decide whether "a pastoral situation" occurred which warranted removal of the missions' spiritual leader; all of these incursions into religious controversy constitute a large leap beyond the constitutional boundary. Inextricably entangled is whether the priest's performance of his duties as a priest met the requirements of his church as measured by ecclesiastical concerns.

The Supreme Court in *Serbian Orthodox Diocese* crystallized the constitutional mandate "that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." 426 U. S. 713. What is involved here falls within that territory, which must remain foreign to civil tribunals.

The application of the Supreme Court's established principles by the lower federal court in *Crowder v. Southern Baptist Convention,* supra, and by this court in *Monahan v. Sims,* supra, show the way which must be trod by this court in reversing the trial court in this case. As quoted by this court in *Monahan* from *Kedroff v. St. Nicholas Cathedral,* 344 U. S. 94, 116 (73 SC 143, 97 LE 120) (1952): "Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." As demonstrated by *Serbian Eastern Orthodox Diocese,* the removal of the clergy is also an ecclesiastical matter even when property is involved.

The trial court was correct in granting summary judgment to the defendant church and denying summary judgment to the plaintiff priest, but for the reason that it did not have jurisdiction. A judgment

right for any reason is to be affirmed. *Orkin Exterminating Co. v. Walker*, 251 Ga. 536, 539 (307 SE2d 914) (1983).

*Judgment affirmed. Carley, C. J., Birdsong and Benham, JJ., concur. McMurray, P. J., concurs in the judgment only. Deen, P. J., Banke, P. J., Sognier and Pope, JJ., dissent.*

DEEN, Presiding Judge, dissenting.

I concur fully with the dissent of Presiding Judge Banke. However, the points made by the majority opinion provoke additional comments.

1. The United States Supreme Court has devised a tripartite test in considering establishment clause questions. Under *Lemon v. Kurtzman*, 403 U. S. 602 (91 SC 2105, 29 LE2d 745) (1971), (a) any governmental action affecting religion must have a secular purpose; (b) the principal or primary effect of that governmental action must be one that neither advances one religion nor inhibits another religion; and (c) the governmental action must not constitute an excessive entanglement of government with religion. A minimal intrusion by the government into the affairs of religion, if it passes all three prongs of the *Lemon* test, is constitutionally permissible.

In the instant case, the trial court's and this appellate court's consideration and enforcement of the employment relationship between the appellant and the appellee had a purely secular purpose of resolving an employment contract dispute that just so happened to involve a church and a minister. In no way can it be said that enforcement of the employment contract here either advances or inhibits religion. Likewise, resolution of contract disputes of this nature hardly constitutes an excessive entanglement of government and religion. It is important to note that no religious dogma, doctrine, creed, tenet, or theological issue is involved in resolving this contract law dispute. See *Jones v. Wolf*, 443 U. S. 595 (99 SC 3020, 61 LE2d 775) (1979).

2. In cases of this nature, it should also be remembered that the establishment clause discussed above calls for the separation of state and religion, not church and state; separation of church and state is misnamed, misunderstood, and mistaken nomenclature. The establishment clause's prohibition and restriction actually is addressed to the state, and concerns forbidding the government's favoring or inhibiting or singling out any one religion for special treatment over another; the original idea was that the government should be substantially neutral as to religion. The restriction and prohibition is against state action, not any religious action. "[T]he Constitution . . . affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U. S. 668, 673 (104 SC 1355, 79 LE2d 604) (1984). The concept of religion has expanded from its original theistic definition to its present theis-

tic and sometimes nontheistic definitions, particularly as far as the free-exercise clause is concerned. See *Roberts v. Ravenwood Church of WICCA*, 249 Ga. 348 (292 SE2d 657) (1982). Historically, up until recent years, in matters involving the establishment and free exercise clauses, a uniform definition of religion was used ("In God We Trust"; "Creator Endowed Rights"; a notion of theism). Today a narrower definition of religion is employed in establishment clause considerations, as compared to use of a broad definition when the free exercise clause is invoked. When the latter clause is used, nontheism is also considered a religion. *Torcaso v. Watkins*, 367 U. S. 488 (81 SC 1680, 6 LE2d 982) (1961). With the expansion of the definition of religion, the sphere of possible governmental intrusion likewise is bound to increase. It thus becomes imperative and increasingly important to remember that the determinative emphasis is whether the governmental action is substantially neutral while being accommodating, rather than becoming hostile, to religion. In this case, the bottom line is that the courts are concerned merely with a secular employment contract dispute, which is neither plus nor minus to any religion, and certainly no excessive entanglement of government and religion.

Several examples of cases (a) denoting *permissible* intervention and intrusion and (b) *impermissible* intervention and intrusion, with religious implications and into religious controversies, are set forth below, so that a difference and distinction may be clearly seen:

A. (1) *Reynolds v. United States*, 98 U. S. 145 (25 LE 244) (1878). (Government *permission* to intrude, in criminal convictions of polygamy over religious claim that more than one spouse was a religious practice, was approved. Religious beliefs may not be regulated by government, but religious actions may be reviewed.) (2) *Walz v. Tax Comm.*, 397 U. S. 664 (90 SC 1409, 25 LE2d 697) (1970). (Government's intervention in approving tax exemptions for religious property was *permissible,* and did not constitute an excessive, entanglement with religion.) (3) *McGowan v. Maryland*, 366 U. S. 420 (81 SC 1101, 6 LE2d 393) (1961). (Sunday legislative government closing laws did have a secular purpose as a uniform day of rest. While it was consistent with religious practice, it was a minimal *permissible* intrusion into religion.) (4) *Marsh v. Chambers*, 463 U. S. 783 (103 SC 3330, 77 LE2d 1019) (1983). (A state legislature had paid a chaplain who began sessions with a prayer. This minimal intrusion into religion was *permissible* under the sometimes-used historical test, rather than the most-time used tripartite test — the same as "In God We Trust" — used on government coins.)

B. (1) *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U. S. 696 (96 SC 2372, 49 LE2d 151) (1976). (Here, the government or court was prohibited from intruding into who controlled the "Diocese's Assets," and reorganization of the diocese into three dioceses.

Decisions regarding church doctrine, tenets and assets was an *impermissible* intervention.) (2) *Presbyterian Church v. Hull Mem. Presbyterian Church*, 393 U. S. 440 (89 SC 601, 21 LE2d 658) (1969). (Governmental or court determinations of ecclesiastical questions are *impermissible* intrusions.) (3) *National Labor &c. Bd. v. Catholic Bishop*, 440 U. S. 490 (99 SC 1313, 59 LE2d 533) (1979). (Use of compulsory bargaining under the National Labor Relations Act to parochial schools poses as a hostility or threat to religion and is *impermissible* entanglement.) (4) *Stone v. Graham*, 449 U. S. 39 (101 SC 192, 66 LE2d 199) (1980). (Posting the "Ten Commandments" on schoolroom walls had an *impermissible* religious, rather than a secular, purpose.) (5) *Engel v. Vitale*, 370 U. S. 421 (82 SC 1261, 8 LE2d 601) (1962). (A prayer worded by the Board of Education and required to be recited daily had a religious, rather than a secular, purpose and would be an *impermissible* entanglement between government and religion.)

It is clear the facts of the instant case fit like a glove the former examples under (a) rather than (b).

3. In *Lyons v. Planters' Loan &c. Bank,* 86 Ga. 485 (12 SE 882) (1890), one issue was whether church property could be applied to satisfy a debt a church owed its former pastor for services as a clergyman. Chief Justice Bleckley was at his most eloquent in analyzing the case:

"Here then is a debtor having some property, perhaps sufficient property, to discharge the debt. Why should it not be so applied? If any debt ought to be paid, it is one contracted for the health of souls — for pious ministrations and holy services. If any class of debtors ought to pay as matter of moral as well as legal duty, the good people of a christian church are that class. No church can have any higher obligation resting upon it than that of being just. The study of justice for more than forty years has impressed me with the supreme importance of this grand and noble virtue. Some of the virtues are in the nature of moral luxuries, but this is an absolute necessary of social life. It is the hog and hominy, the bacon and beans of morality, public and private. It is the exact virtue, being mathematical in its nature. Mercy, pity, charity, gratitude, generosity, magnanimity, etc., are the liberal virtues. They flourish partly on voluntary concessions made by the exact virtue, but they have no right to extort from it any unwilling concession. They can only supplicate or persuade . . . On the credit side of justice we can make any sacrifice of it that we will, but on the debit side we can make none whatever. I may burn as an offering my own bull or lamb, but not that which rightfully belongs to another owner. There is nothing more exalted than a strict duty and its performance. What we freely give cannot be better bestowed than what we pay in discharge of a perfect obligation. The law grants ex-

emptions of property to families, but none to private corporations or collective bodies, lay or ecclesiastical. These must pay their debts if they can. All their property legal and equitable is subject. *Atlanta v. Grant &c. Co.*, 57 Ga. 340. We think a court may well constrain this church to do justice. In contemplation of law, justice is not only one of the cardinal virtues, it is the *pontifical virtue.*" Id. at 490-491. (Emphasis supplied.) Bleckley received nationwide recognition for the latter expression of acknowledging and confirming justice as the pontifical virtue.

A similar analysis is appropriate in the instant case to reach the conclusion that the church can be constrained to do justice in this simple and secular employment contract dispute. The majority opinion fails to meet the requirement of accommodating religion even though we deal here only with a secular purpose. Not even a minimum of entanglement with religion, much less an excessive entanglement, is here involved. This results in hostility and discrimination toward religion inasmuch as our courts usually monitor all employment contracts of others, but here the majority turns its back on aiding resolution of contracts of religious groups. With this unfair, hostile, and discriminatory treatment by government toward religion I cannot agree.

I am authorized to state that Presiding Judge Banke joins in this dissent.

BANKE, Presiding Judge, dissenting.

This case does not involve a dispute over ecclesiastical doctrine or church leadership but merely a dispute over whether the parties contracted for a definite term of employment and whether, if so, the appellee breached that contract by discharging the appellant without cause prior to the end of the term. No one is arguing that the bishop did not have the power to relieve the appellant of his pastoral duties. The question is simply whether the appellant was entitled to continue to receive his salary, a fact which undoutedly explains why the appellee never raised the First Amendment issue until questioned by this court during oral argument of the case.

"[T]he [United States Supreme] Court has . . . rejected an absolute rule that civil courts are powerless to resolve any church property dispute. *Bouldin v. Alexander*, 82 U. S. (15 Wall.) 131 (21 LE 69) (1872); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U. S. 440 (89 SC 601, 21 LE2d 658) (1969); *Jones v. Wolf*, 443 U. S. 595 (99 SC 3020, 61 LE2d 775) (1979). Thus, Supreme Court decisions have attempted to strike an appropriate balance between the establishment and free exercise concerns implicated when a court is asked to resolve an ecclesiastical dispute, and the interests of the state and the aggrieved party in resolution of the con-

troversy by a court of law." *Crowder v. Southern Baptist Convention*, 828 F2d 718, 721 (11th Cir. 1987).

The decision of the majority in the present case does not attempt to strike such a balance but appears to create an absolute prohibition against the adjudication of any employment dispute between a cleric and his or her church, regardless of whether it is based on the alleged breach of a contractual obligation. I am greatly troubled by the very broad implications of this decision. Will it allow, for example, that a church may defeat an action for back pay for services rendered by a priest merely by asserting that its doctrine prohibits it from acknowledging such debts? As I believe that the present controversy involves property rights only and does not call for a resolution of any ecclesiastical or theological dispute, I would hold that the trial court does have jurisdiction to entertain the action. Accord *Gervin v. Reddick*, 246 Ga. 56 (2) (268 SE2d 657) (1980); *Hickman v. Booker*, 231 Ga. 129 (1) (200 SE2d 279) (1973). Compare *Monahan v. Sims*, 163 Ga. App. 354 (294 SE2d 548) (1982); *Serbian Orthodox Diocese v. Milivojevich*, 426 U. S. 696 (96 SC 2372, 49 LE2d 151) (1976).

2. By the language of the manual of directives furnished to the appellant at the inception of his employment, the diocese clearly manifested its belief that the appellant was contractually bound to a minimum three-year term of employment. Compare *Swanson v. Lockheed Aircraft Corp.*, 181 Ga. App. 876 (2) (354 SE2d 204) (1987); *Burgess v. Decatur Fed. Savings &c. Assn.*, 178 Ga. App. 787 (345 SE2d 45) (1986); *Miles v. Bibb Co.*, 177 Ga. App. 364 (339 SE2d 316) (1985). I would accordingly hold that the trial court erred in denying the appellant's motion for partial summary judgment on the issue of whether such a contract existed; and I would reverse the grant of summary judgment to the appellee, leaving for adjudication in the trial court the issue of whether a breach of contract occurred or whether the appellant's employment was properly terminated for cause.

I am authorized to state that Presiding Judge Deen, Judge Sognier, and Judge Pope join in this dissent.

DECIDED MARCH 17, 1989 —
REHEARING DENIED MARCH 31, 1989 —

*Elizabeth F. Bunce, Michael K. Mixson*, for appellant.
*Brent J. Savage, Dorothy W. Courington, Christopher E. Klein*, for appellee.