A98A1012. LEOPOLD et al. v. ST. PAUL'S GREEK ORTHODOX CHURCH et al.

(509 SE2d 121)

MCMURRAY, Presiding Judge.

This appeal followed an order dismissing Stratton Leopold and others' (plaintiffs) petition for an injunction to stop the removal and replacement of religious icons and an iconscreen inside the sanctuary at St. Paul's Greek Orthodox Church in Savannah, Georgia. The trial court's dismissal order provides (in pertinent part) as follows: "Plaintiffs brought this Petition for Injunction as a class-action, on their own behalf, and on behalf of the majority of the members of St. Paul's Greek Orthodox Church who voted at a duly called and convened Special Parish Assembly meeting on January 28, 1996. Defendant St. Paul's Greek Orthodox Church (hereinafter 'Defendant St. Paul's') is a Non-Profit Georgia corporation which has been incorporated under the laws of the State of Georgia since 1907. Defendant St. Paul's received title to its real property by a Deed dated August 1, 1949 and thereafter said Deed was recorded in the Office of the Clerk of the Superior Court of Chatham County.

"This dispute involves the fate of the current iconscreen and icons found inside St. Paul's Greek Orthodox Church located at 1401 Bull Street, Savannah, Chatham County, Georgia. Plaintiffs brought this Petition seeking a Temporary and Permanent Restraining Order restraining Defendant from attempting to remove, replace or otherwise dispose of the iconscreen and icons. Plaintiffs also ask that the Court permanently enjoin Defendant 'from denying the validity of the actions taken by a majority vote during the January 28, 1996 Special Parish Assembly Meeting.' Finally, Plaintiffs seek an injunction against the Church preventing it from executing any contract or expending any funds for the removal, replacement or disposition of the iconscreen and icons from their present location and that it be further enjoined from executing any contract or expending any funds for the purchase or erection of a new or a different iconscreen or icons.

"Defendant St. Paul's has moved to dismiss the Plaintiffs' Petition contending that the central issue in this case unnecessarily involves this Court in ecclesiastical affairs which this Court is prohibited from engaging in under the First Amendment to the United States Constitution and under the provisions of the Constitution of the State of Georgia. Plaintiffs then moved for summary judgment and the Court entertained oral argument on said motion on July 15, 1997. Having taken all matters under advisement the Court now issues the following ruling, dispositive of all pending motions and the request for interlocutory injunction.

*Background*

*I. Hierarchy of the Orthodox Church/Corporate Nature of St. Paul's*

"Under Georgia constitutional jurisprudence there are two types of church governments: congregational and hierarchical. A congregational church is independent of other associations, while a hierarchical church is associated with other churches that share similar faith and doctrine and have a common ecclesiastical head. *Crumbley v. Soloman*, 243 Ga. 343, 254 S.E.2d 330 (1979). The Eastern Orthodox Church is a hierarchical church government. *Kedroff v. St. Nicholas Cathedral of Russia Orthodox Church*, 344 U. S. 94 (1952); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U. S. 696, 724 (IV) (1976). It is undisputed that Defendant St. Paul's is a Parish (local community church) chartered by the Greek Orthodox Church Diocese of America and [is] hierarchical in nature. It is further undisputed that the Church is structured whereby an Archbishop heads the Archdiocese, and the Archdiocese is then split up into a diocese [led] by a Bishop with its chief administrative assistant being the Chancellor of the Diocese. The Parish is headed by a Priest appointed by the Bishop of the Diocese in which the Parish is located.

"The Parish of St. Paul's was first formally incorporated under Georgia law in 1907. It is now organized as a non-profit corporation under Georgia's Non-Profit Corporation Code. The corporation officially adopted By-Laws dated January 26, 1992, . . . which incorporated the *Special Regulations and Uniform Parish Regulations of the Greek Orthodox Archdiocese of North and South America*, as periodically amended (hereinafter 'Special Regulations'). The corporation's By-Laws, at Article VIII, further provide that any by-law which conflicts with any provisions of the Special Regulations shall be void.

"The Special Regulations provide a hierarchy of governance within the local Parish. Furthermore, the local Parish is not free to ignore or violate the Special Regulations and remain part of the Greek Orthodox Church. Each Parish is cooperatively administered by its Priest and Parish Council. The Parish Council consists of the Priest and fifteen parishioners and is 'responsible for conducting all affairs of the Parish in keeping with the aims and purposes as set forth in the Special Regulations. . . .' The Parish Council is also deemed to be the Board of Directors of the corporate entity. The Parish Council is vested with the authority to, *inter alia*, 'buy, sell or mortgage Parish property . . .' and may 'exercise all additional authority consonant with the Regulations herein, the Parish By-Laws, and the limitations imposed by the laws of the state in which the Parish is incorporated.'

"The members of the Parish are called parishioners. To be a

parishioner in good standing, certain financial obligations to the Parish have to be met as well as certain religious obligations and requirements. All parishioners in good standing are members of the Parish Assembly. Parish Assemblies are required to be held whenever the Parish Council deems it necessary or when a written petition is presented to the Parish Council 'stating the purpose thereon for such meeting.' The meetings of the Parish Assembly are to be conducted in accordance with *Robert's Rules of Order*. The parishioners elect Parish Council members who are nominated at Parish Assemblies. Parish Council members do not serve until their election is ratified by the Bishop.

## II. Property Rights at Issue

"Defendant St. Paul's concedes that pursuant to the Special Regulations, the Parish 'hold(s) title to all real and personal property in its corporate name and no other, except as otherwise required by any applicable law.' This is the common practice for every Parish in the Greek Orthodox Diocese. However, Defendant further points to the Special Regulations' language which puts control of such property in the hands of the Parish Council when it provides that the 'Parish Council shall administer such property for the Parish.' Defendant St. Paul's contends that renovation of an existing church building is subject to hierarchical decision making as specified in the Special Regulations, Art. II, § 4. This section of the Special Regulations, which Defendant further argues is at the heart of this case, provides as follows: 'In order to maintain an Archdiocesan standard for architectural iconographic and artistic integrity, before a Parish shall proceed to have final plans prepared for the erection of a church structure or other parish building, the major structural alteration to an existing church structure or other parish building, or the decoration, including iconography, of a church structure, it shall submit the preliminary plans therefor to the Bishop who shall forward the same to the Archbishop for approval. All final plans for any such construction, alteration, and/or decoration, shall be submitted to the Bishop in a like manner for approval by the Archbishop before the Parish enters into any contract for the accomplishment of the work.'

"Finally, Defendant presented testimony from the Chancellor of the Greek Orthodox Diocese, Atlanta, and at least one Plaintiff conceded during cross-examination that under church doctrine and theology, parishioners may not dispose of their property or make changes in the church structure without the consent and approval of the Diocese/Bishop. In fact, all church property held in the name of the local Parish is subject to the Bishop's and Archbishop's direction, as the local Parishes are deemed 'stewards' of that property in the

name of Christ, His Church, and in the name of the Archdiocese[.] Under church law, these parishioners do not own St. Paul's Church.

### III. Iconography

"As set forth above, the dispute in this case involves the icon-screen (also called the 'iconstation' or 'iconstasis'), . . . located inside St. Paul's Church. The iconstation is a screen upon which religious images, or icons, are depicted. An icon is a holy image that has been consecrated by a Bishop, and is considered 'visual Scripture.' In Orthodox theology, parishioners do not pray to the icons, instead parishioners pray through the image, to God. The iconscreen physically separates the altar from the church proper[.] No one, including artists performing work on icons, can touch the icons unless they are recognized iconographers or otherwise approved through ceremony for such work. Furthermore, icons are never discarded, even when damaged; they must be packaged and sent to Constantinople, where they will be burned.

"Defendant St. Paul's challenged renovation plans entail replacing the current iconstasis with a new one incorporating Byzantine iconography. There are two styles of iconography at issue here: the Byzantine, or traditional style, and the Renaissance or Western style. The central distinction between the Byzantine style and the Western style is that the Byzantine style is not intended to be life-like. The icons must . . . not be in the worldly terms and are thus depicted through the use of elongated noses, fingers and hands on the persons shown. The existing iconography is in the Western style; a style that is tolerated, but not in conformity with orthodoxy. These icons were originally approved as they would have been in the only art available at that time. In the early part of this century, the Orthodox Church began directing in accordance with church doctrine, that all renovations and new construction be done in the Byzantine style, as the one Orthodox architectural style.

### IV. Factual Backdrop of Present Dispute

"As set forth above, a Special Parish Assembly meeting took place on October 24, 1993 and a majority of the members present voted to proceed with a proposed $750,000.00 renovation of the Church. As the renovation plans subsequently developed, this vote included a plan to replace the iconstation and icons in the sanctuary due to their allegedly deteriorating condition. On February 22, 1994, Bishop Philip of Atlanta, the Bishop at the time, approved the plans submitted by Defendant St. Paul's. After some research and inspection by experts in the field, several Parish members determined the iconstasis and icons were in the experts' opinion, not in poor condi-

tion and could simply [be] cleaned and restored, rather than destroyed and replaced. At this point, these members and others in good standing presented a petition and requested via postcards, a special meeting to re-examine the issue of renovation. Subsequently, the church office sent out a notice or agenda concerning the special meeting of the Parish Assembly. The notice and postcards specifically addressed the plan of moving to reconsider the interior renovation project approved back in 1993. Bishop Philip became aware of the brewing dispute and instructed the Priest and Parish Council not to have the General Assembly until he returned from a trip to Greece. The Special General Assembly was had despite this instruction.

"This Special General Assembly Meeting was held on January 28, 1996. After moving to rescind the prior 1993 Assembly decision dealing with the iconscreen and icons, . . . and the same being seconded, a secret vote was taken on the issue. The vote was 63 in favor of the motion and 56 against it; a simple majority. A dispute ensued as to whether the recission [sic] could be accomplished by a simple majority vote or necessitated a two-thirds vote. All material concerning the dispute was provided to then presiding Bishop, Bishop Iakovos. The Bishop ruled against the Petitioners. The Bishop made his decision 'after a careful and prayerful study and consideration of all issues involved.' He wrote a letter to the Parish setting forth his decision and directed in relevant part that, '[a]ll steps taken by the Parish Council and the Committee on Renovation and Capital Improvements leading up to, and including, the February 22, 1994 approval of the planned project by Bishop Philip are VALID AND MUST BE RESPECTED.' The Bishop went on to say that[,] while the committee was instructed to consult with the architect and iconographer as to the most creative and appropriate placement and/or incorporation of the present screen and its icons in the scheme of the renovation, the iconscreen and icons were to be replaced. As a matter of church doctrine and ecclesiastical law, the Special General Assembly cannot make a decision contrary to the Bishop's ruling. Subsequently, Plaintiff parishioners filed the subject petition.

### Discussion of Issues

"Based upon the entire record and after considering the arguments of counsel, both written and oral, the Court finds it is prohibited by the First Amendment, applicable to the courts of Georgia by the Fourteenth Amendment, from exercising judicial authority in this dispute. *McDonnell v. Episcopal Diocese*, 191 Ga. App. 174, 175, 381 S.E.2d 126 (1989) (physical precedent only) *citing Milivojevich, supra* (holding that the Illinois state courts contravened the First and Fourteenth Amendments by engaging in improper inquiries into

ecclesiastical matters, a prohibited zone even though some property questions were involved); *Crowder v. Southern Baptist Convention*, 828 F.2d 718 (11th Cir. 1987); *Monahan v. Sims*, 163 Ga. App. 354, 359 (2), 294 S.E.2d 548 (1982). The civil court cannot take jurisdiction of an ecclesiastical issue even if the parties present it for resolution, because the First Amendment prohibits such action by the civil judicial system. *McDonnell, supra.* Furthermore, 'civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.' *McDonnell, supra*, 191 Ga. App. at 177 *citing Milivojevich, supra*, 426 U. S. at 713. The Court finds that what is involved here falls within that territory, which must remain foreign to civil tribunals. Though the dispute centers around the iconstation and icons, which admittedly are items of physical property, the Court would necessarily have to delve into ecclesiastical matters by examining the Bishop's and Defendant's decision to change the style of iconography via replacing the current iconstasis and icons. The style of iconography and movement to replace church property with Byzantine style as well as decisions as to the handling and disposition of the iconstation, are matters deeply rooted in the religious beliefs of the Church. Plaintiffs would have this Court determine whether or not the Bishop has the authority to instruct the Parishioners, over their vote, as to the fate of the iconstation. This the Court cannot do." (Footnotes and trial court's references to the record omitted.)

*Held*:

Plaintiffs contend the case sub judice involves a property dispute which can be resolved under "neutral principles of law" — a permissible category of court inquiry. See *Kidist Mariam Ethiopian Orthodox Tawahedo Church v. Kidist Mariam Ethiopian Orthodox Tawahedo Church*, 219 Ga. App. 470, 472 (1) (465 SE2d 491). We do not agree.

There is no question (under "neutral principles of law") that plaintiffs, as members of the local parish, are conferred with property rights to the icons and iconscreen which are the subject of this dispute. Nor is it disputed that plaintiffs voluntarily subject themselves to hierarchical church authority and that this authority deemed it necessary to remove and replace the icons and iconscreen in St. Paul's Greek Orthodox Church because this property is not compatible with the religious organization's practices and principles. Under such circumstances, we agree with the trial court that any judicial tampering with this directive would involve an impermissible interference under the First Amendment of the United States Constitution, applicable via the Fourteenth Amendment. See *McDonnell v. Episcopal Diocese of Ga.*, 191 Ga. App. 174 (381 SE2d 126).

*Judgment affirmed. Blackburn and Eldridge, JJ., concur.*

DECIDED NOVEMBER 10, 1998

*Gannam & Gnann, Michael J. Gannam,* for appellants.
*Duffy, Feemster & Lewis, George L. Lewis,* for appellees.