Michael A. HUEGERICH, Appellee,

v.

IBP, INC. a/k/a Iowa Beef Processors, Inc., Appellant.

No. 94–1865.

Supreme Court of Iowa.

April 17, 1996.

As Corrected May 24, 1996.

Gary W. Armstrong of Mack, Hansen, Gadd, Armstrong & Schiller, P.C., Storm Lake, for appellant.

Edward Bjornstad of Bjornstad Law Office, Spirit Lake, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and ANDREASEN, JJ.

ANDREASEN, Justice.

Michael A. Huegerich brought an action against his employer, Iowa Beef Processors, Inc. (IBP), for alleged wrongful conduct associated with his discharge. The district court entered judgment in favor of Huegerich for negligent discharge and defamation. Because we do not recognize negligent discharge as an exception to the employment at-will doctrine and find insufficient proof of the publication of defamatory statements, we reverse the district court's judgment.

### I. Background Facts and Proceedings.

IBP operates a large hog processing plant in Storm Lake, Iowa. At the plant, there is a comprehensive alcohol and drug policy which includes a prohibition against the possession of "legend" or "look-alike drugs" on company property. A look-alike drug is a substance having a similar appearance or the same effect as an illegal drug. The company policy provides that a violation of any prohibition may result in severe disciplinary action including discharge.

The alcohol and drug policy, including the look-alike drug provision, is strictly enforced. IBP believes that in order to provide a safe work environment, it is imperative to keep alcohol and drugs out of the plant. Virtually every day as employees enter the plant, a few are randomly selected and inspected for prohibited substances. In the past four years, six individuals have been found to have look-alike substances in their possession which have contained the chemical ephedrine, a stimulant. Of these six, five were discharged from their employment. The first was Michael Huegerich.

In 1989 Huegerich began working at Transcontinental Cold Storage (TCS), which is a division of IBP. In December of 1990, he transferred to the quality control department in the IBP plant. He was an hourly employee and not hired for a specific period of time. At quality control, he was first assigned to the job of grading hog carcasses. After mastering this inspector's job, he was promoted to the boneless loin line. At each of these positions, his performance was satisfactory.

On March 29, 1991, as he was entering the plant, Huegerich was randomly selected and inspected for prohibited substances. The inspection took place in the plant's security office. He emptied his coat pockets and produced a small container of pills labeled Maxalert which is an over-the-counter asthma medication. The label described Maxalert as an ephedrine hydrochloride. The pills were small white tablets with a white cross pressed in them. They are identical in appearance to the illegal street drug amphetamine referred to as "white cross" or "speed."

The head of security, Jack Hunnel, and the head of the quality control department, Tom Henrich, were called to the security office. Hunnel put a pill from the bottle in a test kit designed to determine if the pill contained the stimulant ephedrine. The test used causes a substance in the test vials to turn purple if ephedrine is present. It tested positive. Hunnel said that it was white cross. Huegerich offered to submit to a blood or urine drug test but he was denied the opportunity.

Huegerich was suspended for two days and told he should come in the following Monday. When Huegerich returned to the plant on April 1, he was notified by Henrich and Lonny Jepsen, the personnel manager, that he was terminated for possessing a look-alike drug on plant property in violation of IBP's policy. After the discharge, IBP had four different labs analyze the pills confiscated from Huegerich. The results confirmed the pills were Maxalert and not an illegal amphetamine.

On both March 29 and April 1, Huegerich explained why he had possession of the Maxalert. About a week earlier Huegerich and his girlfriend were visiting her parents. His girlfriend, who suffers from asthma, forgot to bring her inhaler so they stopped at a convenience store and purchased the Maxalert. Huegerich put the bottle in his coat pocket and forgot he had the pills until stopped for the random inspection. He did not think there was a problem because he knew Maxalert is an over-the-counter product which does not require a prescription.

IBP has an orientation process during which new employees are advised of the drug policy, including the prohibition of look-alike drugs. There is training to help the new employees identify drugs and look-alike drugs. Huegerich, however, did not go through the orientation program because he transferred into the plant from TCS.

Huegerich testified that he was generally aware of IBP's drug policies, but not aware of the policy prohibiting look-alike drugs. Because he did not go through the normal orientation process, he did not receive a copy of IBP's policy nor was he advised of the policy. He did not know of the policy prohibiting look-alike drugs in the plant until the day he was searched.

About six months after Huegerich was discharged, an IBP employee told Huegerich that he had heard he was fired for possession of speed. Huegerich tried to explain the medicine was actually for his girlfriend but the employee did not believe him. Later an assistant production supervisor also told Huegerich that he had heard he had been fired for speed.

Huegerich brought an action against IBP for alleged wrongful conduct associated with his discharge. The original petition contained five separate counts: wrongful discharge, negligent discharge, defamation, breach of implied covenant of good faith and fair dealing, and outrageous conduct. The petition was amended on the eve of trial by adding a retaliatory discharge claim and deleting both the negligent discharge and implied covenant of good faith and fair dealing counts. On August 31, 1994, the action was tried to the district court. At the end of the trial, Huegerich moved to amend the petition to reallege the implied covenant of good faith and fair dealing count. The amendments were granted by the district court. Huegerich did not reallege negligent discharge.

The district court entered judgment in favor of Huegerich and against IBP for wrongful discharge in the amount of $24,000, and for defamation in the amount of $20,000. The court concluded that Huegerich could not prevail under the claim of outrageous conduct, breach of implied covenant of good faith and fair dealing, or retaliatory discharge. The wrongful discharge judgment was based upon a theory of negligent discharge. The court concluded that IBP was negligent in the administration of its strict drug policy, in failing to provide Huegerich with an orientation program, and specifically in failing to advise him that his employment could be terminated if he were found in possession of look-alike drugs.

On appeal, IBP contends the district court erred in (1) recognizing a cause of action for negligent discharge, (2) considering negligent discharge when it was not pled at the time of trial, and (3) finding that IBP defamed Huegerich.

Our scope of review is for corrections of errors at law. Iowa R.App.P. 4.

## II. *Negligent Discharge.*

 We begin with the firmly ingrained rule that an employer may discharge an at-will employee at any time, for any reason, or no reason at all. *Borschel v. City of Perry,* 512 N.W.2d 565, 566 (Iowa 1994); *Lara v. Thomas,* 512 N.W.2d 777, 781 (Iowa 1994); *French v. Foods, Inc.,* 495 N.W.2d 768, 769

(Iowa 1993); *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989). We have recognized two narrow exceptions to this general rule: (1) where the discharge clearly violates a "well-recognized and defined public policy of the state"; and (2) where a contract is created by an employer's handbook or policy manual. *Borschel,* 512 N.W.2d at 566 (citing *French,* 495 N.W.2d at 770, quoting *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 560 (Iowa 1988)).

The district court considered these recognized exceptions to the employment at-will doctrine and determined that Huegerich's discharge did not fit within any of them. The court did find, however, that IBP had a duty to Huegerich in the implementation and administration of its drug policy and was negligent in the performance of this duty. The court, relying on *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123, 1137 (Alaska 1989), held Huegerich was entitled to receive notice of the look-alike drug policy. Because IBP had failed to advise him that his employment could be terminated if he was found in possession of a look-alike drug, the court held that IBP was negligent in discharging him. Although *Luedtke* was based upon an implied covenant of good faith and fair dealing, the district court believed IBP's negligence should be considered a wrongful discharge.

IBP urges that negligent discharge is simply a new label for the doctrine of implied covenant of good faith and fair dealing. We expressly rejected a breach of an implied covenant of good faith and fair dealing exception to the employment at-will doctrine. *Porter v. Pioneer Hi–Bred Int'l, Inc.,* 497 N.W.2d 870, 871 (Iowa 1993); *French,* 495 N.W.2d at 771; *Grahek v. Voluntary Hosp. Co-op Ass'n,* 473 N.W.2d 31, 34 (Iowa 1991). We have joined a majority of jurisdictions in doing so. *Fogel,* 446 N.W.2d at 456–57. Although the two theories are analogous, we believe negligent discharge justifies separate consideration.

A limited number of jurisdictions have recognized a cause of action for negligent discharge. *See* 82 Am.Jur.2d *Wrongful Discharge* §§ 182, 183 (1992). Although Huegerich cites cases from Montana which recognized a theory of negligence for wrongful discharge, Montana no longer recognizes negligent discharge as an exception to termination of employment at-will. *Kittelson v. Archie Cochrane Motors, Inc.,* 248 Mont. 512, 813 P.2d 424, 426 (1991); *see also* Mont.Code Ann. § 39–2–913 (1995) (expressly precludes any common-law claim for wrongful discharge arising from tort or expressed or implied contract).

Other jurisdictions have refused to recognize negligent discharge as an exception from the employment at-will doctrine. 82 Am. Jur.2d *Wrongful Discharge* § 182 (1992); *see Johnson v. Delchamps, Inc.,* 897 F.2d 808, 810–11 (5th Cir.1990) (under Louisiana law, employer cannot be held liable in tort for discharging at-will employee based on polygraph results, even if examination was negligently conducted); *Demars v. General Dynamics Corp.,* 779 F.2d 95, 100–01 (1st Cir. 1985) (under Massachusetts law, an employer can "discharge an employee negligently and in bad faith"); *Shaver v. F.W. Woolworth Co.,* 669 F.Supp. 243, 244–45 (E.D.Wis.1986), *aff'd,* 840 F.2d 1361 (7th Cir.1988), *cert. denied,* 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988) (Wisconsin does not recognize cause of action for negligence in employment termination cases); *Salazar v. Furr's, Inc.,* 629 F.Supp. 1403, 1410 (D.N.M. 1986) (New Mexico has not accepted negligence in the context of employee discharge); *Walt v. Alaska,* 751 P.2d 1345, 1351 (Alaska 1988) (no common-law tort for negligent investigation of termination of state employee); *Alford v. Life Savers, Inc.,* 210 Neb. 441, 315 N.W.2d 260, 261 (1982) (affirming dismissal of petition which alleged that employer negligently terminated employee); *Finck v. City of Tea,* 443 N.W.2d 632, 635 n. 3 (S.D.1989) (negligent wrongful discharge is not actionable in South Dakota).

To recognize a theory of negligent discharge would require the imposition of a duty of care upon an employer when discharging an employee. Such a duty would radically alter the long recognized doctrine allowing discharge for any reason or no reason at all. Consequently, we reject negligent discharge as an exception to the employment at-will doctrine. We reverse the district court's

judgment that IBP negligently discharged Huegerich.

We need not address whether the district court erred in considering the negligent discharge claim when at the time of trial the pleadings did not allege the claim.

## III. *Defamation.*

 The law of defamation consists of the twin torts of libel and slander. *Lara*, 512 N.W.2d at 785. The gist of defamation is the publication of written or oral statements which tend to injure a person's reputation and good name. *Id.* (citing W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 111, at 771 (5th ed. 1984)). Generally, the statements must be false and demonstrably about the person claiming to be defamed. Restatement (Second) of Torts § 558 (1977). The truth of the statement is an absolute defense. *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989); 50 Am.Jur.2d *Libel & Slander* § 268 (1995); Restatement (Second) of Torts § 581A. An employer or corporation may be held liable for defamation by an employee if the defamatory statement was published while the employee was acting within the scope of his or her employment. *Vowles v. Yakish*, 191 Iowa 368, 371–72, 179 N.W. 117, 119 (1920); *see* 50 Am.Jur.2d *Libel & Slander* §§ 359, 360 ("an employer would properly be held liable for a defamatory statement made by one of its employees while conducting an internal investigation on the employer's behalf"); Restatement (Second) of Torts § 577 cmt. f.

 Some statements are considered to be defamatory per se if they are of a nature that a court can presume as a matter of law that their publication will have a defamatory effect. *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984). To accuse a person of an indictable crime is defamation per se. *Rees v. O'Malley*, 461 N.W.2d 833, 835 (Iowa 1990). The crime must either involve moral turpitude or subject the person accused to a sentence of incarceration. *Id.* We have found that an employer's inquiries as to whether an employee had a "drug problem" could be defamatory per se because the imputation of

substance abuse clearly reflects on an employee's capacity and fitness to perform his or her duties. *Lara*, 512 N.W.2d at 785; *see also Vinson*, 360 N.W.2d at 115–16 (employer's statements accusing employee of falsifying information on time cards were libel per se). Likewise, statements accusing a person of possessing illegal drugs, such as speed, would constitute defamation per se. *See* 50 Am.Jur.2d *Libel & Slander* § 180.

 Ordinarily, a plaintiff must prove that defamatory statements were false, made with malice, and caused damage. *Vinson*, 360 N.W.2d at 115. If a statement is determined to be defamatory per se, the elements of malice, falsity, or damage need not be proven. *Id.* The plaintiff, however, still bears the burden of proving the element of publication. *Higgins v. Gordon Jewelry Corp.*, 433 N.W.2d 306, 310 (Iowa App.1988); Restatement (Second) of Torts § 613 cmt. d.

 Publication is an essential element of defamation and simply means a communication of statements to one or more third persons. *Belcher v. Little*, 315 N.W.2d 734, 737 (Iowa 1982); Restatement (Second) of Torts § 577 cmt. b. A defamatory communication is not published, and is therefore not actionable, unless it is heard and understood by a third person to be defamatory. *Royston v. Vander Linden*, 197 Iowa 536, 536–37, 197 N.W. 435, 435–36 (1924); *see Andreas v. Hinson*, 157 Iowa 43, 44–45, 137 N.W. 1004, 1005 (1912); Restatement (Second) of Torts § 577 cmt. c. In determining what the third person understands, the defamatory statement must be viewed in the context of the surrounding circumstances and within the entire communication. *Kidd v. Ward*, 91 Iowa 371, 374, 377, 59 N.W. 279, 280–81 (1894); *see also Jones*, 440 N.W.2d at 891; Restatement (Second) of Torts § 563 cmts. d, e.

 Publication does not exist when the defamatory statements are made only to the person who is being defamed, and it is that person who disseminates the information. *McBride v. City of Sioux City*, 444 N.W.2d 85, 92 (Iowa 1989); Annotation, *Libel & Slander: Publication by Accidental Communication, or Communication Only to*

*Plaintiff,* 92 A.L.R.2d 219 §§ 6, 7 (1963). An exception to this rule exists if the one being defamed is under a strong compulsion to communicate the defamatory statements to others. *Belcher,* 315 N.W.2d at 738. Furthermore, a person who makes a defamatory statement is liable for damages resulting from the repetition of the statement if the repetition was reasonably foreseeable. *Brown v. First Nat'l Bank,* 193 N.W.2d 547, 555 (Iowa 1972). Recovery is limited to damages that were a probable and natural consequence of the original statement or its repetition. *Id.* Every repetition of a defamatory statement "constitutes a claim which is separate and independent from any claims arising out of the original publication." *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 14 (Iowa 1990).

Huegerich's defamation claim is based on two occurrences: (1) when Hunnel described the pill tested as white cross; and (2) when IBP employees told Huegerich they heard he was fired for possession of speed. Although the content of both statements could be determined as defamatory per se, IBP contends that Huegerich failed to prove the element of publication. We agree.

### A. Hunnel's Use of the Words "White Cross."

■ Huegerich testified that Hunnel put a pill in a bottle, shook it up and said, "Yeah, it's a white cross." During this time Hunnel, Huegerich, and Henrich were in the security office and *no one outside the office could* hear the conversation. The district court specifically found that no one outside the office could hear the conversation about Huegerich being in possession of white cross.

The key to whether Hunnel's statement meets the publication requirement of defamation is whether Henrich, the third person, heard and understood the statement to be defamatory. Henrich testified that he observed Hunnel perform the test. He understood that when the liquid in the vial turned purple, the pill tested "was a substance that IBP policy expressly forbid from being in the plant." He did not testify regarding any statements made by Hunnel.

We find the record does not contain sufficient evidence that Henrich heard and understood that Hunnel was accusing Huegerich of possessing an illegal substance. While discussing the situation with Jepsen after the testing, Hunnel described the pills as a look-alike drug. Furthermore, he expressly terminated Huegerich for a violation of IBP's look-alike drug policy, not for bringing an illegal controlled substance into the plant. We conclude that Huegerich failed to prove that Hunnel published a defamatory statement when he described the pill as white cross.

### B. IBP Employees Who Heard Huegerich Was Fired For Speed.

Huegerich testified that on two occasions IBP employees told him that they heard he was "fired for speed." No evidence was introduced as to how, when, and from whom the individuals heard that Huegerich was terminated for possession of speed. The district court found that defamatory information was published to the employees who confronted Huegerich after he was discharged but noted that there was "not much testimony regarding the extent of the publication of the defamatory information."

On appeal, Huegerich contends one or both of two possible events must have occurred:

1. When Hunnel completed the test in the security office, the test kit was visible through the windows so that employees outside the security office could see the purple color of the test and they could conclude that Huegerich had been caught with illegal amphetamines; or

2. The people in the security office at the time of the search or someone in management communicated to other IBP employees that Huegerich had speed in his possession at the time of the random search.

■ As for the first scenario, the inspection and subsequent testing were done in front of the windows with IBP personnel walking back and forth outside. Employees entering or leaving the plant could have seen the activities involving Hunnel, Henrich, and Huegerich. The district court found that other employees could observe Huegerich in the security office with his supervisor and

the director of security "and they would draw their own conclusions about what was going on." The court stated, however, that "[a]lthough it is possible that people could have observed the purple color in the kit, it is highly improbable." The court specifically found that "no one outside the security office actually saw the test results." Although the general proceedings in the security office could have been observed by other employees, the test result and ensuing conversation would have been known only to Hunnel, Huegerich, and Henrich.

The courts have recognized that a defamatory communication may be published through actions or conduct as well as through spoken or written words. 50 Am.Jur.2d *Libel & Slander* §§ 154, 250; Restatement (Second) of Torts § 568(2) cmt. d; Gregory G. Sarno, Annotation, *Libel or Slander: Defamation by Gestures or Acts,* 46 A.L.R.4th 403 § 3 (1986). Courts have reached different results on whether the act of terminating an employee is defamatory. 46 A.L.R.4th 403 § 7; *see, e.g., Davis v. Ross,* 754 F.2d 80, 84 (2d Cir.1985) (merely stating that employee was terminated is not defamatory); *O'Bryan v. KTIV Television,* 868 F.Supp. 1146, 1170 (N.D.Iowa 1994) ("mere publication of an employee's demotion is not itself defamatory"); *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 742 F.Supp. 1359, 1371 (N.D.Ill.1990) (mere publication of an employee's termination is not itself defamatory). Likewise, different results have also been reached on whether an investigation by an employer into a suspected crime of an employee constitutes a defamatory publication. 46 A.L.R.4th 403 § 8(c); *see* 50 Am. Jur.2d *Libel & Slander* §§ 248, 329 ("an employer may investigate suspected wrongdoing without being liable for defamation because others become aware of the investigation and the subsequent discharge of particular employees"). We believe the actions of IBP management in conducting the random search and subsequent discharge of Huegerich are insufficient to constitute a defamatory publication.

We now address the second scenario that IBP management communicated to other employees that Huegerich had speed in his possession at the time of the random search. If proven true, such a communication and subsequent repetition could constitute defamation. Huegerich offered no evidence, however, as to how or from whom the IBP employees heard that he was terminated for possession of speed. Huegerich testified that he did not know and the employees did not testify at trial. Because Huegerich failed to identify the source of these communications, he fails to meet his burden of proving the element of publication.

The district court concluded from the evidence presented at trial that "[t]he only other way these people would have attained this misinformation is from Hunnel, Henrich, or Jepsen, or the other IBP supervisors whom Jepsen consulted with prior to advising plaintiff that he had been discharged." We believe alternative explanations for the source of this information exist. The conclusions that other employees drew from their own observations of the activity in the security office and Huegerich's subsequent discharge could be the source of the inaccurate comments heard by the employees.

We conclude that the evidence is insufficient as a matter of law to establish publication of defamatory statements by IBP management. Accordingly, we reverse the district court's judgment.

**REVERSED.**