Rhonda **TAGGART**, Appellant,

v.

**DRAKE UNIVERSITY, an Iowa Corporation, Tom Worthen, and Myron Marty, Appellees.**

No. 95–329.

Supreme Court of Iowa.

June 19, 1996.

Fred L. Dorr of Wasker, Dorr, Wimmer & Marcouiller, P.C., Des Moines, for appellant.

Harold N. Schneebeck and CeCelia C. Ibson of Brown, Winick, Graves, Gross, Baskerville, Schoenebaum & Walker, P.L.C., Des Moines, and James R. Swanger and Margaret Callahan of Belin Harris Lamson McCormick, A P.C., Des Moines, for appellees.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and ANDREASEN, JJ.

HARRIS, Justice.

■ Because they lack both the resources and expertise necessary to superintend such matters, courts have a profound reluctance to intercede in selection decisions for college faculties. Universities thus possess nearly unfettered discretion when deciding whether to reappoint an untenured professor for another year of service. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 2709–10, 33 L.Ed.2d 548, 561 (1972). The district court granted summary judgment for a university in this suit by a probationary faculty member who reasonably expected to be, but was not, granted tenure. Although we do not entirely agree with the trial court's analysis, we think summary judgment was correct.

The facts, as presented for submission of the summary judgment motion, indicate a classic clash between a highly talented art educator and her academic superior. Plaintiff Rhonda Taggart began working for defendant Drake University in its college of fine arts in 1985 as a part-time lecturer on graphic design. The following year plaintiff received a letter offering her a faculty appointment with the rank of instructor of art for the 1986–87 academic year. The letter stated Drake "operates in conformity with the general policies regarding tenure established by the [American Association of University Professors] AAUP." In accordance with AAUP standards, university regulations require the annual evaluation of all nontenured, regular faculty members. These evaluations serve as the basis for the dean's reappointment decisions. Nontenured faculty appointments at Drake are only for one-year terms, and are renewed (or terminated) on an annual basis. The chair of the art department, Condon Kuhl, explained to plaintiff that the normal procedure was to consider a faculty member for promotion after four years and for tenure during the sixth year.

After receiving highly favorable evaluations, plaintiff was offered and accepted subsequent appointments for the 1987–88 and the 1988–89 academic years and was given substantial wage increases. She was in fact promoted to the rank of assistant professor effective for the 1988–89 academic year. Her performance appears to have been superb. She received high accolades for revitalizing Drake's graphic design program, for her outside exhibitions and endeavors, and for her teaching prowess. In recognition of these outstanding efforts, she was named co-recipient of the Burlington Northern Junior Teacher of the Year award at Drake for the 1987–88 academic year. Each of plaintiff's letters of reappointment indicated she was a tenure-track faculty member.

This auspicious outlook went awry in 1988 when Tom Worthen became the new department chair. A dispute arose almost immediately concerning submission of plaintiff's work for critical review by the art faculty as part of her annual evaluation. Plaintiff objected to the lack of stated criteria or standards for judging her work, noting the uniqueness of the various activities performed by a graphic designer in a commercial setting.

One of the categories in the annual evaluation was labeled "scholarly and artistic developments." Activities in this category included professional research and study, publications, grants, presentations, performances, exhibits, and compositions. The nub of plaintiff's dispute with Worthen is this: it is unusual for graphic designers to exhibit art works in an academic or professional setting. This is because the work of graphic artists normally consists of consultations with private clients. Because of the uniqueness of her specialty, plaintiff insists it is more difficult to submit the work of a graphic artist for peer review than it would be for others in the art department.

So plaintiff refused to provide what Worthen deemed to be sufficient work for review and her annual evaluations, although still positive, began to suffer in the scholarship-artistic development category. The matter came to Dean Myron Marty's attention on several occasions, and he urged Worthen and plaintiff to come to an amicable solution. When the dispute remained unresolved, Dean Marty asked plaintiff to propose standards for judging her work. Her proposals were then sent to Worthen for his comments. But when plaintiff's proposals reached Worthen, he objected to the dean's interference in what he believed was strictly a faculty matter. The dean conceded the point and promptly withdrew his proposed solution.

In spite of this growing controversy, plaintiff was reappointed for the 1989–90 and the 1990–91 academic years. In February 1991, following two meetings of a faculty evaluation committee, Worthen recommended to Dean Marty that plaintiff's next appointment be a terminal one. Worthen told Marty that the terminal appointment was recommended because of plaintiff's refusal to provide adequate documentation or attend reviews and the poor judgment reflected in such refusals. By letter, Dean Marty informed plaintiff:

> Consistent with the University's policies affecting probationary faculty members who are not recommended for continuation

toward tenure, I am authorized to offer you a terminal appointment for the academic year 1991–92 with the rank and title of Assistant Professor of Art....

Plaintiff accepted the appointment but not its terminal nature. She challenged her termination, asserting it denied her several procedural rights. Dean Marty rejected plaintiff's challenge and, in accordance with Drake's academic charter, plaintiff appealed the rejection to the university's academic freedom and tenure committee. That committee concluded plaintiff had been given all procedural considerations due her and plaintiff appealed her case to the university's president. He refused to intercede.

Forced to seek other employment, plaintiff sued Drake, Worthen, and Dean Marty, alleging that Drake breached her employment contract, that Dean Marty intentionally inflicted emotional distress upon her, and that Worthen defamed her before her colleagues. Defendants' motion for summary judgment was sustained and plaintiff has brought this appeal. Our review is on error. Iowa R.App.P. 4.

■ I. Employment can be at will, for a term, or permanent. Even though Drake makes some attempt to contend otherwise, the employment here was clearly more than at will. By all accounts it consisted of a series of one-year terms. The dispute involves claims that Drake violated its agreement during the series of terms regarding plaintiff's efforts to move from term employments to a permanent one.

■ To maintain a breach-of-contract action against Drake, plaintiff first has the obvious burden of proving the existence of an enforceable contract. *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 283 (Iowa 1995) (party seeking recovery on basis of unilateral contract has burden to prove existence of such contract). The trial court rejected plaintiff's claim that rules and regulations set forth in the faculty handbook, academic charter, and various memoranda issued by the dean became implied terms of her annual appointment letter and thereby gave rise to enforceable contractual rights.

■ Even though at will employment is not implicated here, at will cases explain how employee handbooks can be the basis of employment contracts. There is ample authority for the proposition that university rules, regulations, policies, and by-laws can become implied terms of a faculty employment contract and thereby create enforceable rights. *Rehor v. Case Western Reserve Univ.,* 43 Ohio St.2d 224, 331 N.E.2d 416, 420 n. 2, *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 390 (1975); *see also Ofsevit v. Trustees of the California State Univ. & Colleges,* 21 Cal.3d 763, 148 Cal.Rptr. 1, 582 P.2d 88, 92 (1978); *Board of Trustees of the State Colleges of Md. v. Sherman,* 280 Md. 373, 373 A.2d 626, 629–30 (App.1977).

In order to rise to the level of an enforceable contract of employment, the handbook or other document given to an employee by an employer must meet three requirements: (1) the document must be sufficiently definite in its terms to create an *offer;* (2) the document must be communicated to and accepted by the employee so as to create *acceptance;* and (3) the employee must continue working, so as to provide *consideration. McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989). The parties dispute only the first of these three requirements so we confine our discussion accordingly.

■ The record here reveals the existence of several procedural rights. A publication issued by the standing committee of the faculty senate on academic freedom and tenure in April 1991 states:

Rights of nontenured faculty are stated in the academic charter of Drake University, articles IV, V, VI, and VII. The committee on academic freedom and tenure will serve as a hearing body whenever a hearing is required as a result of a complaint that a nontenured faculty member's rights have been abridged.

The academic charter and its accompanying appendices outline seven procedural standards for the renewal or nonrenewal of appointments of probationary faculty members:

(1) Faculty members shall be advised early in their appointment of the substantive and procedural standards em-

ployed in decisions affecting renewal and tenure.

(2) There shall be a periodic evaluation of faculty members' performances during the probationary period.

(3) Faculty members shall be advised of the time when decisions affecting renewal or tenure (*i.e.*, the periodic evaluations) are normally made and given the opportunity to submit material believed to be helpful to an adequate consideration of the faculty member's circumstances.

(4) Faculty members shall be given advance written notice that a probationary appointment will not be renewed in accordance with established timetables.

(5) Faculty members shall be entitled to be informed in writing of the reasons which contributed to the nonrenewal decision.

(6) Faculty members shall have the opportunity to request reconsideration of the nonrenewal decision by the evaluation committee.

(7) If a faculty member believes the committee's nonrenewal decision was based on either considerations in violation of academic freedom or inadequate consideration, he or she shall have the right to petition the academic freedom and tenure committee. If, after review according to established procedures, the committee determines there was a denial of substantive or procedural fairness, it shall recommend necessary action to correct the wrong to the provost and appropriate dean.

We think these statements were sufficient to create an enforceable contract under the test of definitiveness espoused in *McBride* and its progeny. *See Anderson,* 540 N.W.2d at 283, 286 (noting that when considering whether a handbook—or other material—creates a contract, we utilize unilateral contract theory, and apply three factors in making this inquiry).

■ II. This requires us to consider the third element, which, as plaintiff asserts and Drake denies, was whether there was a breach of the contract. Plaintiff claims Drake breached the contract in five ways, the first and most obvious of which was by failing to provide established procedures for her evaluation and for faculty participation in the process. Drake contends the criteria for evaluation were detailed in the annual evaluation forms and were also explained in section III of the faculty handbook. Plaintiff contends these details were wholly inadequate to qualify under her contract because their general nature did not provide an adequate measuring device for her specialty in graphic design.

We understand plaintiff's lack of confidence in any realistic chance for an objective or fair evaluation under the circumstances. Her skepticism was no doubt heightened by the incident, previously related, when the dean suggested a reasonable solution that was rejected by Worthen. Nevertheless, although one might not entirely admire how the system was applied in plaintiff's case, the short answer is that the law is clearly in Drake's favor.

■ The burden rested squarely on plaintiff to present evidence that would support a finding that her contract called for criteria any more specific than that already provided by Drake. *See* Iowa R.App.P. 14(f)(5) (burden of proof ordinarily on the one who would suffer loss if the issue were not established). Plaintiff did not meet this burden. The employment contract did not demand detailed or particularized criteria for plaintiff's specialty. And the contract, it must be remembered, deals with relationships in which nontenured educators are widely known to have no assurance of achieving tenure.

IV. Plaintiff also argues the contract was breached in other ways. For her second claimed breach, she argues she was never adequately advised on the procedural standards used in decisions affecting contract renewal. But this contention is contrary to fact. The same documents plaintiff alleges to have created her employment contract also contain an explanation of the evaluation process.

■ Third, plaintiff contends she never was given advance notice of meetings nor the opportunity to submit information to the

committee which recommended her appointment not be renewed. This contention, to whatever extent it differs from her first and second ones, fails because plaintiff repeatedly refused to submit adequate documentation of her private consultations as requested by Worthen to be used for annual evaluation purposes. In other words, plaintiff had no right to demand, as a condition for her own compliance, that Drake provide more criteria than was called for in the contract.

Finally plaintiff argues, after the decision was made to recommend nonrenewal of her employment, she was not informed of the committee's recommendation or decision, as required by Drake's academic charter. The facts are otherwise; plaintiff was informed in writing more than a year in advance by Worthen, the evaluation committee chair, and Dean Marty, that failure to provide visual documentation of her consultation work, coupled with her failure to attend graduate and undergraduate reviews, had effectively withdrawn her from the promotion and tenure process. Furthermore, plaintiff was given full access to, and in fact did utilize, the appeals process established by the academic freedom and tenure committee.

We conclude that summary judgment was appropriate against plaintiff's contract claim.

■ V. Plaintiff's second assignment challenges the grant of summary judgment against her claim for intentional infliction of emotional distress. The claim is grounded on her allegations that, in a meeting held in his office, Dean Marty lost his temper, began yelling at her in a sexist and condescending manner, referred to her as a "young woman," and accused her of causing trouble and "making my life difficult." Plaintiff further alleges that, while verbally berating her, Dean Marty got up out of his chair and leaned over the table glaring at her in a threatening manner. Finally plaintiff contends the outburst was intended to cause, and did in fact cause, her to fear for her physical safety and suffer emotional distress and anxiety.

■ To assert a claim for the tort of intentional infliction of emotional distress, a plaintiff must demonstrate four elements: (1) outrageous conduct by the defendant; (2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress; (3) the plaintiff has suffered severe or extreme emotional distress; and (4) actual proximate causation of the emotional distress by the defendant's outrageous conduct. *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985). The controlling question here, under the first element, is whether the alleged conduct could reasonably be regarded as outrageous. To qualify, the conduct must be extremely egregious; mere insult, bad manners, or hurt feelings are insufficient. *See* Restatement (Second) of Torts § 46 cmt. d (1965) (cited in *Northrup*, 372 N.W.2d at 198–99).

A factor in plaintiff's favor is the dean's supervisory authority over her. *See Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984) (stating an employer has a duty to refrain from abusive behavior towards employees). Even considering this factor though, we think the conduct alleged here does not qualify as outrageous under the standard we have outlined. The trial court was correct in so holding.

■ VI. The trial court was also correct in entering summary judgment against plaintiff's defamation suit. Defamation is the invasion of another's interest in reputation or good name. *See Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). It consists of the twin torts of libel and slander—the former being written and the latter being oral. *Id.* To establish a prima facie case in any defamatory action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff. *See* W. Page Keeton et. al, *Prosser & Keeton on the Law of Torts* § 113, at 802 (5th ed. 1984) [hereinafter *Prosser* ]; *see also Johnson*, 542 N.W.2d at 510.

■ The trial court held that intra-university communications between administrators and tenured faculty members, sitting as a faculty committee, were not "published" for purposes of defamation law. We have not ruled on the point, and authorities from other jurisdictions are in conflict. One line of analogous cases reasons that intra-office defamation is simply the corporation talking to it-

self, and thus does not amount to publication. *See, e.g., Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 289 (8th Cir.1982); *Monahan v. Sims,* 163 Ga.App. 354, 294 S.E.2d 548, 551 (1982); *Commercial Union Ins. Co. v. Melikyan,* 424 So.2d 1114, 1115 (La.App.1982); *Ellis v. Jewish Hosp. of St. Louis,* 581 S.W.2d 850, 851 (Mo.App.1979); *Jones v. Golden Spike Corp.,* 97 Nev. 24, 623 P.2d 970, 971 (1981). The other line of analogous cases holds that, although communications between supervisory employees of a corporation regarding another employee may be qualifiedly privileged, they are still considered publication. *See Arsenault v. Allegheny Airlines, Inc.,* 485 F.Supp. 1373, 1379 (D.C.Mass.), *aff'd,* 636 F.2d 1199 (1st Cir.1980), *cert. denied,* 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981); *Pirre v. Printing Dev., Inc.,* 468 F.Supp. 1028, 1041 (S.D.N.Y.), *aff'd,* 614 F.2d 1290 (2d Cir.1979); *Kelly v. General Tel. Co.,* 136 Cal.App.3d 278, 186 Cal.Rptr. 184, 186 (1982); *see also Prosser,* § 113, at 798 n. 14 (favoring the view that communications are publication and dismissing those cases holding otherwise as confusing publication with privilege); Restatement (Second) of Torts § 577 cmt. i (1977). The rationale of the second line of cases is explained this way:

> Damage to one's reputation is the essence and gravamen of an action for defamation. It is reputation which is defamed, reputation which is injured, reputation which is protected by the laws of libel and slander. Certainly, damage to one's reputation within a corporate community may be just as devastating as that effected by defamation spread to the outside. Thus, the injury caused by intracorporate defamation should not be disregarded simply because the corporation can be sued as an individual entity.
>
> Defendant argues that corporate employees must be free to evaluate and comment on their employees' work performance and that this freedom will be unduly restrained if they are liable for intracorporate defamation. However, the law in this state has already extended protection to comments made within a work situation by means of a qualified privilege.... By virtue of the qualified privilege, the employer who is evaluating or investigating an employee in good faith and within the bounds of the employment relationship is protected from the threat of defamation suits.... We see no reason for greater freedom from liability for defamation to be accorded the corporate employer than that already available to all employers through the qualified privilege.

*Luttrell v. United Tel. Sys., Inc.,* 9 Kan. App.2d 620, 683 P.2d 1292, 1294 (1984), *aff'd,* 236 Kan. 710, 695 P.2d 1279 (1985) (citations omitted).

There is logical support for both views. The first is more consistent with the wise reluctance of courts to intrude into faculty matters. The second is a reasonable recognition that, because professional careers hang in the balance, there should be a chance for judicial oversight in extreme cases in which the damaging statements proceed from malice rather than from professional considerations.

We need not and do not opt for either line of cases because plaintiff loses either way. If the documents were not published, there was no defamation. If we were to agree with the second view, plaintiff loses because the documents were protected by qualified privilege.

■■■■ We recognize two types of privileged communications: those that are absolutely privileged and those that are qualifiedly or conditionally privileged. *See Vojak v. Jensen,* 161 N.W.2d 100, 105 (Iowa 1986). Absolute privilege affords a complete defense under any circumstances, even if actual malice is shown, while qualified privilege provides immunity in some but not all instances. *Id.* Qualified privilege is at issue here. Qualified privilege is an affirmative defense that must be pled and proven. *Vinson,* 360 N.W.2d at 116. Qualified privilege attaches to communications made (1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation in the subject matter of the communication. *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972).

■■■■ Qualified privilege applies to publications without regard to whether they are

defamatory per se, but it protects only those statements made without actual malice. *Vinson*, 360 N.W.2d at 116. In other words a publication is no longer privileged and becomes actionable upon proof of actual malice. *Id.* A finding of actual malice turns on the motive for the communication, and requires proof that the statement was made with ill will or wrongful motive. *Id.* at 117. Actual malice occurs when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity. *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 894 (Iowa 1989); *McCarney v. Des Moines Register & Tribune Co.*, 239 N.W.2d 152, 156 (Iowa 1976). There is nothing in the record that would support a finding that Worthen (or anyone at Drake) harbored *actual* malice against plaintiff.

All statements which plaintiff finds objectionable arose out of Worthen's performance of his annual evaluation of her. As part of the evaluation process, Worthen was required to pass judgment, based on his observations and academic experience. In doing so, although plaintiff thinks otherwise, we think his comments can only be viewed as having been made in good faith. Worthen expressed concern with the documentation of plaintiff's scholarly projects and commercial consultations, but praised her teaching ability and program development. While plaintiff may disagree with Worthen's assessment of her performance, nothing in the record suggests that he harbored some specific "intent to inflict harm through falsehood," as is required under the law. *McCarney*, 239 N.W.2d at 156 (explaining a showing of antagonism, contempt, or even intent to inflict harm are insufficient to show malice; rather, there must be an intent to inflict harm through falsehood).

Plaintiff thus cannot overcome the qualified privilege which attaches to the alleged defamatory statements, even if they were published.

Summary judgment was appropriate.

**AFFIRMED.**