Jyll M. **NEWELL,** Plaintiff–Appellant,

v.

**JDS HOLDINGS, L.L.C.** and Jacquelyn Preston, Defendants–Appellees.

No. 12–1712.

Court of Appeals of Iowa.

April 24, 2013.

---

464

Matthew J. Reilly of Eells & Tronvold Law Offices, P.L.C., Cedar Rapids, for appellant.

Bruce L. Gettman Jr. and Bradley M. Strouse of Redfern, Mason, Larsen & Moore, P.L.C., Cedar Falls, for appellees.

Heard by EISENHAUER, C.J., and POTTERFIELD and TABOR, JJ.

TABOR, J.

After being fired from her position as a massage therapist, Jyll Newell sued her employer, JDS Holdings, and her supervisor, Jacquelyn Preston. Newell alleged she was wrongfully discharged in violation of public policy because she declined to sign a form acknowledging receipt of an employee handbook without first consulting an attorney. She also alleged Preston defamed her and intentionally interfered with her prospective business advantage because Preston lied to the company's owner about Newell's conduct. The district court granted summary judgment in favor of the defendants on all three claims, and Newell appealed.

We affirm the grant of summary judgment on the wrongful discharge claim because Newell did not show she was fired for engaging in protected activity. We also find summary judgment was proper on Newell's claim that Preston intentionally interfered with her prospective business advantage because the record contains no evidence Preston aimed to financially injure Newell. But we reverse the grant of summary judgment on Newell's defamation claim because the record reveals a genuine issue of material fact as to whether Preston abused her qualified privilege.

*I. Background Facts and Proceedings*

Dr. John Schofield owns JDS Holdings, LLC, which operates Elements Therapeutic Massage (Elements) studio in Cedar Falls. Jyll Newell is a massage therapist. She began working at Elements in January 2008. Her employer presented Newell with an employee handbook and an acknowledgment form, which she signed and dated on March 24, 2008. The acknowledgment form stated that the policies and benefits described in the handbook were subject to revision. It also explained Newell was an at-will employee of Elements.

On May 5, 2008, Newell received her first performance evaluation from studio manager Kathy Mundfrom. One a scale of one to five, Newell received a rating of five (excellent) in each of the seven categories on the three-month review. In her first annual performance review, Newell again scored five out of five in each of the seven categories on the evaluation form. Newell earned a raise effective January 1, 2009. On December 17, 2009, Newell received her second annual performance evaluation. Her supervisor rated her at the top of the scale in each of the eight categories listed. Again, she received a raise.

Elements hired Jacquelyn Preston as studio manager in March 2010. That month, Preston jotted a favorable note in Newell's file: "Thanks for taking later hours on Monday night. Clients are very glad to have that scheduling option. I appreciate your assistance in interviewing and mentoring. MARVELOUS." But Newell's file also revealed a number of absences in 2010.

On January 7, 2011, Preston completed Newell's three-year performance evaluation. Newell received scores of four (above average) or five (excellent) in nine of the ten categories. In the category of "Accurate and timely SOAP[1] notes on all clients and follows other company procedures," Preston rated Newell at four with the following explanation: "Getting better. SOAP notes commonly missed as noted in comm. log but significant efforts to improve." In the category of "Arrives to work on time," Newell received a score of between three (Average) and four (Above

1. SOAP is an acronym for Subjective, Objective, Assessment, and Plan.

Average) with the following note: "Arrives on time but attendance has been an issue." The evaluation stated that Preston and Schofield advised Newell that her attendance was problematic, but she was "working on the concern." Newell's total performance score was forty-three out of a possible fifty, or eighty-six percent. Newell again received a raise, which moved her to the top of Element's pay scale.

On February 24, 2011, the employer presented a revised employee handbook to Newell and asked her to sign a form acknowledging its receipt. The form stated:

> By signing below, I certify that I have received and understand that I should read and must abide by this handbook. Without limiting the foregoing, I understand that my employment with elements therapeutic massage is at-will and that either I or the elements therapeutic massage may terminate the employment relationship at any time, with or without reason.

Newell told Preston she wanted to read the handbook before signing the acknowledgment. Preston told her to sign the acknowledgment and read the handbook later. Newell did not sign the form that day.

On February 25, 2011, Newell signed and dated the receipt and acknowledgment form. Below her signature, she wrote: "I have concerns with 3.16, 5.1 (suspension for not receiving a massage), and 6.2 communication devices. I have spoken with Jackie Preston regarding these concerns." Later that day, Preston showed Newell an email from Schofield which read: "Jackie– Tell Jyll to sign the agreement as written, without ambiguous comments or face termination for cause." Newell also saw an email from JDS Holdings' attorney Bradley Strouse, which stated:

> The employee handbook is a condition of employment. We have the right to change it whenever we want without notice. That is part of employment at will. Employees can either sign and return the receipt of handbook page or face termination for cause. You could point out that while he/she might not like everything in there, it is take it or leave it. We should insist that she sign the receipt and acknowledgment without ambiguous comments.
>
> If he/she or a lawyer thinks one of the policies in the handbook is contrary to law, he or she can write me, with citations, explaining exactly how they believe the handbook violates the law.

When Newell balked at signing the acknowledgment without first consulting her attorney, Preston told her if she did not sign it immediately she was fired. Preston then left the room and Newell called her attorney. Newell did not sign the form that day. Schofield called Newell that Friday night and told her that she was not fired after all. He asked her to report for her regularly scheduled shift that Sunday. Schofield told Newell she could review the handbook and they would meet later to discuss it.

Newell continued to work her regular schedule. On February 28, 2011, Newell provided massage therapy to Amy Tomlyanovich. Preston claimed she overheard Newell tell client Tomlyanovich that it was "scary" to work for JDS Holdings.

On March 4, 2011, Newell signed the employee handbook acknowledgement form without qualification.

Schofield and Preston met to discuss Newell's absences, her failure to do SOAP notes, and her complaining. Preston mentioned the "inappropriate" conversation Newell was alleged to have had with Tomlyanovich earlier that week. Schofield and Preston also discussed Newell's failure to sign the employee handbook. In addition,

the pair raised a concern that Newell was performing massage therapy on clients outside of Elements.

On March 6, 2011, Schofield and Preston met with Newell and terminated her employment. When Newell asked why she was being fired, Schofield asked if she recalled her conversation with Tomlyanovich. The employer also mentioned her failure to sign the handbook. A separation of employment form signed on that date provided the following explanation for her termination: "Continued attendance issues. Repeated counseling re: attendance + contact logs. Refusal to sign handbook multiple times. Breach of proper conduct in behaviors. Threat to violate non-compete agreement by working anywhere and taking clients."

Newell filed a petition against JDS Holdings and Preston on May 2, 2011. She alleged she was wrongfully discharged in contravention of public policy. She also alleged Preston defamed her by communicating false allegations to one or more parties, including Schofield. Finally, Newell alleged Preston intentionally interfered with her prospective business advantage.

The defendants moved for summary judgment and Newell timely resisted. Following a hearing, the district court entered its order granting summary judgment in favor of the defendants on all three of Newell's claims.

## II. Standard of Review

We review a grant of summary judgment for correction of errors at law. *Boelman v. Grinnell Mut. Reinsurance Co.*, 826 N.W.2d 494, 500 (Iowa 2013). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 501.

We view the record in the light most favorable to the nonmoving party. *Id.* We afford the nonmoving party "every legitimate inference that can be reasonably deduced from the evidence." *Id.* If reasonable minds can differ on how the issue should be resolved, a fact question is generated and the court should deny summary judgment. *Id.*

## III. Analysis

### A. Wrongful Discharge

Newell first contends the district court erred in granting summary judgment on her claim of wrongful discharge. She alleges her firing violated public policy because it was based on her refusal to sign the employee handbook form without consulting with an attorney. She also asserts a number of the policies contained in the handbook violate public policy.

While Iowa adheres to the employment-at-will doctrine, we have adopted an exception recognizing the intentional tort of wrongful discharge when the reasons for the discharge contravene a well-established public policy of the state. *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011).

The elements for a cause of action for wrongful discharge are:

(1) existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Id.* at 109–10.

The existence of a public policy and the question of whether that policy is

undermined by a discharge from employment are questions of law to be determined by the court. *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 (Iowa 2000). Therefore, these questions are properly resolved by a motion for summary judgment. *Id.* Questions of causation and motive, on the other hand, are factual in nature and are to be resolved by the fact finder. *Id.* To withstand summary judgment, a plaintiff must not only satisfy the court on the clear public policy and jeopardy elements, but also offer adequate evidence from which a fact finder may infer a lack of justification for termination. *Id.*

In rejecting Newell's wrongful discharge claim, the district court found Newell failed to identify a clearly defined public policy that protects employee activity. The court noted that while Newell claimed six separate provisions of the employee handbook are contrary to public policy, the issue was not whether the inclusion of these provisions violated public policy; the question was whether Newell's termination violated public policy. The court concluded that unless Newell was terminated for not following one or more of the employee handbook provisions, their existence was "immaterial."

The court then returned to Newell's contention she was fired for initially refusing to sign the handbook receipt without consulting an attorney. It found while JDS Holdings denies firing Newell for that reason, when viewing the evidence in the light most favorable to Newell, it is possible that was the employer's ground for termination. But the court concluded termination based on her reluctance to sign the form did not violate public policy. The court noted Newell's failure to cite any specific statutes, administrative regulations, or constitutional provisions to support her position. The court held: "While the Court agrees with Newell that encouraging employees to thoroughly review an employee handbook with or without benefit of counsel is desirable, Newell has not demonstrated that this desirable conduct rises to the level of a clearly defined and well recognized public policy."

On appeal, Newell maintains her firing was inconsistent with her right to consult an attorney. She also identifies provisions of the employee handbook that allegedly violate public policy, and claims the employer retaliated against her for seeking legal advice concerning those questionable provisions.

Newell relies on *Thompto v. Coborn's Inc.*, 871 F.Supp. 1097 (N.D.Iowa 1994). In that case, the federal court determined the Iowa Supreme Court would likely recognize a cause of action for retaliatory discharge based on an employee's threat to consult with an attorney as a violation of public policy. Our supreme court has yet to verify that prediction. *See Ballalatak v. All Iowa Agriculture Ass'n*, 781 N.W.2d 272, 279 (Iowa 2010). In *Davis v. Horton*, the Iowa Supreme Court rejected an employee's argument she was fired for seeking legal assistance: "[O]n the facts of the present dispute, it is clearly impossible to separate Davis's act in hiring an attorney from her act in challenging a personnel decision made by her employer." 661 N.W.2d 533, 536 (Iowa 2003). The court held an employee's rebuke of an employer's personnel decision is not "insulated from sanction merely because it has been carried out through an attorney." *Id.*

Like the situation in *Davis*, it is difficult to segregate Newell's desire to consult with a lawyer from her challenge to the employer's mandate that she promptly sign the handbook acknowledgment form. Accordingly, we question whether she has articulated a clearly defined public policy that would be undermined by her firing.

But we opt to affirm on different grounds. *See Kern v. Palmer College of Chiropractic,* 757 N.W.2d 651, 662 (Iowa 2008) (noting we may affirm a summary judgment ruling on a proper ground urged below but not relied upon by the district court).

 Even assuming Newell has shown the existence of a clearly defined public policy that would be jeopardized, she cannot prove the existence of a fact question on the third or fourth elements of a wrongful discharge claim: that she was engaged in the protected activity and it was the reason for her discharge, and no overriding business justification accounted for her termination. Newell admits she was not fired on February 25, 2011, the day she voiced her desire to speak to her attorney about the handbook. Schofield contacted her that night to inform her she was not fired. Newell admits Schofield said their lawyers "could discuss things" and acknowledged, "I understand that it takes attorneys time to look at things."

Newell's employer mentioned her failure to promptly sign the form in the meeting at which she was fired and listed that conduct on the separation of employment form. But that conduct served as one of several justifications given for her termination. When Newell first asked why she was being fired, Schofield responded by asking if she remembered the conversation she had with Tomlyanovich. Other concerns included Newell's attendance, behavioral and attitude issues, and concerns that Newell was performing massage therapy on clients outside of Elements. On this record, Newell failed to generate a fact question on the claim that her employer fired her for requesting to speak with her attorney before signing the handbook receipt form, without any overriding justification for the termination. Accordingly, we affirm the grant of summary judgment in favor of JDS Holdings.

### B. Defamation.

Newell next contends the district court erred in granting summary judgment on her claim Preston defamed her. At the heart of Newell's defamation claim is Preston's report to Schofield regarding a conversation Preston allegedly overheard between Newell and a massage client. According to Preston, Newell complained to Amy Tomlyanovich that working for JDS Holdings was "scary." Newell also alleges Preston told Schofield that Newell continued to have problems with attendance and turning in her SOAP notes. Newell alleges these statements were false, and Preston knew they were false.

 Defamation is the publishing of written or oral statements that tend to injure a person's reputation and good name. *Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 221 (Iowa 1996). Generally, a plaintiff must prove the statements were false, made with malice, and caused damage. *Id.* Publication, or the communication of statements to one or more third parties, is also an essential element of defamation. *Id.* The publication must reach beyond the person being defamed. *Id.* If a statement is not heard and understood by a third person to be defamatory, the defamatory statement is not published and is therefore not actionable. *Id.*

JDS Holdings challenges whether Preston's statements were published because they were made by a supervisory employee within the company. Some jurisdictions hold intra-office defamation "is simply the corporation talking to itself," and therefore does not qualify as publication to a third party. *Taggart v. Drake Univ.,* 549 N.W.2d 796, 802–03 (Iowa 1996). Other jurisdictions hold communications between supervisory employees of a corporation regarding another employee may be qualifiedly privileged, but are still considered

publications. *Id.* at 803. Our supreme court has not embraced either position, leaving the issue unresolved in *Taggart* because it found the plaintiff could not succeed under either view. *Id.* at 802–03.

Those jurisdictions which do not recognize internal corporate communications as publication to a third party represent the minority position. Rodney A. Smolla, 2 Law of Defamation § 15:8 (2012). The roots of this position can be traced to an early case involving a stenographer. *Id.* (citing *Owen v. Ogilvie Publishing Co.,* 32 A.D. 465, 53 N.Y.S. 1033, 1035 (1898)). In that case, an employee sued her corporate employer for defamation, alleging its general manager defamed her by alleging she had taken money from the cash drawer during her employment. *Owen,* 53 N.Y.S. at 1034. The general manager sent a letter to Owen, stating his suspicions that she stole the money. *Id.* While the court believed the letter was libelous, it found no publication to a third party even though the general manager had dictated the letter to a stenographer because "[t]hey were both employed by a common master, and were engaged in the performance of duties which their respective employments required." *Id.* The *Owen* court explained that where the duties of the servant "are distinct and independent of the process by which the libel was produced, he might well stand in the attitude of a third person through whom a libel can be published." *Id.* at 1035. The difference in *Owen* was the acts of the manager and stenographer were intimately related and the production was the joint act of both. *Id.*

The no-publication position expanded over time. Citing *Owen,* the Washington Supreme Court held a defendant corporation could not be liable for the libelous letter written by one manager about another manager of the corporation and sent to its branch office. *Prins v. Holland–*

*North America Mortg. Co.,* 107 Wash. 206, 181 P. 680, 680–81 (1919). The court held when certain officers and agents of a corporation act in the line of duty to the common employer, "the acts of the one are to be accorded the same legal effect as the acts of the other." *Id.* at 681. The *Prins* court reasoned:

> Agents and employés of [the same principal] are not third persons in their relations to the corporation, within the meaning of the laws pertaining to the publication of libels. For the time being, they are a part and parcel of the corporation itself, so much so, indeed, that their acts within the limits of their employment are the acts of the corporation. For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself.

*Id.* at 680–81.

The "contemporary view" is that intra-office communications do count as publications, but are protected by a qualified privilege, which allows an employee to recover only if the employer abuses the privilege. *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 523, at 185 (2d ed.2011). The Restatement of Laws (Second) on Torts rejects an intra-office exception to publication, and promotes the view that communication between two agents of the same principal constitutes publication. Restatement (Second) of Torts § 577 cmt. i (1977); *see also* W. Page Keeton, ed, *Prosser and Keeton on the Law of Torts,* § 113, at 798 (5th ed. 1984) ("There may be publication to any third person. It may be made to ... the plaintiff's agent or employee. It may be made to the defendant's own agent, employee or officer, even where the defen-

dant is a corporation." (footnotes omitted)). A majority of jurisdictions that have addressed this publication issue have rejected full immunity from defamation for intracorporate communications. *See Dube v. Likins,* 216 Ariz. 406, 167 P.3d 93, 105 (Ct.App.2007).

The question before us here differs a bit from *Prins,* where the corporation was the defendant. Newell brought her defamation claim against Preston, not JDS Holdings. Newell alleges Preston defamed her to Schofield, a third party, which resulted in her termination. To exempt this type of communication from liability because the plaintiff's supervisor only shared it with the company owner would run counter to the purpose of our defamation law. "A defamatory statement made to one's employer can harm one's business reputation with the employer, whether the defamer is a co-worker or is instead removed from the employment relationship." *Wallulis v. Dymowski,* 323 Or. 337, 918 P.2d 755, 760 (1996). Instead, we find a qualified privilege applies to this type of communication.

Our supreme court has recognized an employer's limited privilege with regard to

> communications made in good faith on any subject matter in which the [person communicating] has an interest, or with reference to which he has a duty ... if made to another person having a corresponding interest or duty, on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest.

*Theisen v. Covenant Med. Ctr., Inc.,* 636 N.W.2d 74, 83–84 (Iowa 2001) (quoting 50 Am.Jur.2d *Libel and Slander* § 276, at 547). This privilege applies where a defendant proves: "(1) the statement was made in good faith, (2) the defendant had an interest to uphold, (3) the scope of the statement was limited to the identified interest, and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only." *Id.* at 84. "[T]o defeat a qualified privilege, a plaintiff must prove the defendant acted with knowing or reckless disregard of the truth of the statement." *Barreca v. Nickolas,* 683 N.W.2d 111, 121 (Iowa 2004).

In its summary judgment ruling, the district court found that when viewing the facts in the light most favorable to Newell, the qualified privilege applied to Preston's statement to Schofield. It found Preston, as supervisor, had an interest in her employees' performance, as well as a corresponding duty to apprise Schofield of their performance. The court found Schofield—as the listener—had an equally clear interest in the performance of his employees. The court determined the issue of whether a qualified privilege applies to the communication turned on whether Preston acted in good faith, or if Newell could show Preston spoke with actual malice. The court decided the record did not demonstrate Preston acted with knowledge her statements were false or with a reckless disregard for their truth or falsity. The ruling stated: "While Preston may have been mistaken or inaccurate in some of what she said, it is a big leap from that to actual malice. It is a leap this Court is unwilling to make absent any authority on the issue, which Newell has not provided."

Our task is to decide whether, under the circumstances, Preston's statements were qualifiedly privileged. *See Barreca,* 683 N.W.2d at 118. If they were privileged, we must decide whether she abused that privilege by publishing her statements about Newell with actual malice. *See id.* The test for actual malice does not probe for an improper purpose on Preston's part; the inquiry is whether

Preston acted with knowledge of falsity or reckless disregard for the truth.[2] *See id.* at 123. In general, the question whether a statement is qualifiedly privileged is for the judge and the question whether the privilege was abused is for the jury. *Id.* at 118.

After viewing the evidence in the light most favorable to Newell, we find a material question of fact exists regarding whether Preston published her statements about Newell with knowledge of their falsity or a reckless disregard for the truth. Newell presented evidence that Preston informed Schofield that Newell disparaged the company to a client by saying it was "scary" to work for JDS Holdings. Newell also offered evidence that information led to her termination. Newell denied making any negative statements about her employer to client Tomlyanovich.

In response to the summary judgment motion, Newell submitted Tomlyanovich's deposition, in which Tomlyanovich swore Newell never described JDS Holdings as "scary" or aired any complaints about her employer. Tomlyanovich testified she and Newell may have used the word "scary" when discussing an unrelated topic, but she did not remember if that conversation occurred on the date in question. Tomlyanovich also said Schofield contacted her to ask whether Newell told her JDS Holdings was "scary" and Tomlyanovich informed him that Newell never said that—though it is unclear when this conversation occurred.

Preston's deposition testimony also appears in the summary judgment record. Preston testified she overheard a conversation between Newell and Tomlyanovich while in a space adjoining the massage room. She recalled hearing Newell tell the client it was "scary" to work there. Preston did not recall hearing anything else clearly. When confronted with Tomlyanovich's statement that Newell did not mention any work-related grievances, Preston stated, "That's not what I heard." Preston also acknowledged that after hearing Newell's statement to Tomlyanovich, Preston told another Elements employee, Melissa Champion, something to the effect: "You might have to verify this later, but you know that I was back there measuring the cart, not listening in on conversations."

Newell also contends that Preston's representations to Schofield that Newell had current issues with attendance and turning in client SOAP notes were made with a reckless disregard for the truth. In her deposition, Preston confirmed that Newell had made a significant effort to improve her attendance through the last four months of her employment at Elements. And Newell offered deposition exhibits to show that Preston evaluated her at average to above average in the categories of accurate and timely SOAP notes and attendance—just two months before firing her. Newell also presented evidence that other employees with worse attendance and SOAP note issues continued to work for Elements.

We find a reasonable juror could have determined that Preston entertained serious doubts as to the truth of the statements about Newell that she shared with Schofield on the eve of Newell's termination. Whether Preston sincerely believed she overheard Newell tell a customer that working for JDS Holdings was "scary" is a credibility call. The court is

---

**2.** The Barreca court explained "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *Id.* at 123. The evidence must show the defendant entertained serious doubts as to the truth of his publication because "the actual malice standard requires a high degree of awareness of probable falsity." *Id.*

not entitled to make credibility findings on summary judgment because such determinations are reserved for the fact finder. *Frontier Leasing Corp. v. Links Eng'g, LLC,* 781 N.W.2d 772, 776 (Iowa 2010). We cannot say as a matter of law that Preston did not act with actual malice. Accordingly, we reverse the district court's grant of summary judgment on this claim.

## C. Intentional Interference with Prospective Business Advantage

Finally, Newell asserts the district court erred in granting summary judgment on her claim that Preston improperly interfered with her prospective business advantage. Essentially, Newell claims Preston gave Schofield misinformation in an attempt to have her fired.

■ To prove her claim of interference with a prospective business advantage, Newell must show she had a prospective business relationship with JDS Holdings; Preston knew of the prospective relationship; Preston intentionally and improperly interfered with the relationship by relaying misinformation to Schofield; the interference caused JDS Holdings not to continue the relationship; and the amount of her damages. *See Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990). In a claim of intentional interference with a prospective business advantage, the plaintiff must prove the defendant intended to financially injure or destroy the plaintiff. *Burke v. Hawkeye Nat. Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991). Newell predicates this cause of action on the same facts as her defamation claim.

■ The district court rejected Newell's intentional interference claim, finding that even viewing the record in the light most favorable to her, "there is no evidence that Preston's actions were improper, let alone that they were done with the sole or predominant purpose to financially injure or destroy Newell." The court found it was "entirely proper" for a supervisor to discuss a subordinate's job performance with the employer. Importantly, the court found no evidence Preston communicated misinformation to Schofield with the intent of getting Newell fired, and that Newell's resistance "contains no evidence to support this theory that Preston had some sort of vendetta against Newell and that she engaged in all of this conduct to ensure that Newell lost her position with JDS."

We agree with the district court's finding that Newell has not met her burden of showing a genuine issue of material fact concerning whether Preston intended to financially injure or destroy her. While there is evidence by which the fact finder could determine Preston knew the information she gave Schofield was false or that she acted with reckless disregard for the truth when discussing Newell's conversation with Tomlyanovich and Newell's attendance and SOAP note proficiency, that evidence does not support a claim of intentional interference with a prospective business advantage. *See Willey v. Riley,* 541 N.W.2d 521, 527 (Iowa 1995) (holding defendant's improper purpose to financially destroy plaintiff must predominate to create liability). Accordingly, we affirm the district court's grant of summary judgment on this claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**